# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-00124-COA

**CHARLES IRVIN BRUTON JR.**                                    **APPELLANT**

**v.**

**ALLISON HIPWELL BRUTON**                                      **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 12/30/2016 |
| TRIAL JUDGE: | HON. M. RONALD DOLEAC |
| COURT FROM WHICH APPEALED: | LAMAR COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | DAVID NEIL MCCARTY |
| ATTORNEY FOR APPELLEE: | ALBERT RALPH JORDAN IV |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART; AND VACATED IN PART: 10/30/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**TINDELL, J., FOR THE COURT:**

¶1.     On May 9, 2013, the Lamar County Chancery Court entered an opinion and final judgment granting Allison Bruton a divorce from Charles (Chuck) Bruton.  Chuck filed a petition to modify the judgment.  In his petition, Chuck challenged the requirement that he pay private-school tuition and health-insurance premiums for his minor children, and he requested that the chancellor allow him to claim one of the children as his dependent for income-tax purposes.  In addition, Chuck filed a civil-contempt claim against Allison.  In response, Allison sought increased child support and filed a counter-claim for civil contempt against Chuck.  Except for a ten-percent decrease in the amount Chuck was to contribute to

the children's private-school fees and extracurricular expenses, the chancellor denied Chuck's claims for modification. The chancellor also granted Allison's request for an increase in child support and her claim for contempt and related attorney's fees.

¶2. On appeal, we find the chancellor erred in holding Chuck in contempt. We therefore reverse and render that portion of the chancellor's judgment and vacate the award to Allison of her attorney's fees related to the contempt proceedings against Chuck. As to all the remaining issues raised in this appeal, we affirm the chancellor's judgment.

**FACTS**

¶3. Chuck and Allison married on August 3, 2002. They separated in January 2012 about four days after the birth of their second son. On April 24, 2012, Allison filed a divorce complaint on the grounds of adultery and cruel and inhuman treatment or, alternatively, irreconcilable differences. Chuck responded and requested an irreconcilable-differences divorce. He agreed that Allison was fit and suitable to have full legal and physical custody of the parties' children and that he should pay child support.

¶4. On May 8, 2012, the chancellor entered an agreed temporary order that (1) granted Allison exclusive use and possession of the marital home; (2) ordered Chuck to pay the insurance, taxes, and homeowner's dues for both the home and an unimproved lot the parties owned; (3) ordered Chuck to pay $1,000 a month in child support pursuant to Mississippi Code Annotated section 43-19-101 (Rev. 2009); (4) ordered Chuck to pay the taxes and insurance on the parties' vehicles, the children's daycare expenses, and various other household expenses; and (5) granted Chuck visitation rights. On November 20, 2012, the

parties entered into a temporary agreed order on custody and visitation. Pursuant to the agreed order, the chancellor granted the parties joint legal custody, with Allison receiving sole physical custody and Chuck receiving reasonable visitation rights. The remaining provisions of the May 8, 2012 temporary order remained in effect. The parties submitted all other issues, including child support, equitable distribution, alimony, and attorney's fees to the chancellor for determination.

¶5.     Following a one-day trial, the chancellor entered his opinion and final judgment on May 9, 2013. Through his trial attorney, Chuck admitted that he had committed uncondoned adultery. The chancellor therefore granted Allison a divorce on that ground. The chancellor ordered Chuck to maintain health insurance for the children and to pay their daycare expenses and sixty percent of their private-school tuition and fees.[1] In calculating child support, the chancellor determined Chuck's adjusted gross income exceeded $50,000. Section 43-19-101(1) creates a "rebuttable presumption . . . regarding the awarding or modifying of child support" that the noncustodial parent should pay twenty percent of his or her adjusted gross income for two children. Section 43-19-101(4), however, requires the chancellor to make "written finding[s] in the record as to whether or not the application of the guidelines established in this section is reasonable" when adjusted gross income is greater than $50,000.[2] After concluding the statutory guidelines were "not reasonable, just[,] or

---

[1] Although the parties' sons both attended daycare at the time the chancellor entered his final judgment, the oldest son was scheduled to enroll in elementary school later that year.

[2] Effective July 1, 2013, the Legislature amended section 43-19-101(4) to require written findings as to whether the guidelines are reasonable if the noncustodial parent's

3

appropriate . . . due to the children's expenses that Chuck will be responsible for in addition to child support[,]" the chancellor ordered Chuck to pay $834 a month in child support (or twenty percent of $50,000).

¶6. With regard to the equitable distribution of the marital estate, the chancellor awarded Allison the marital home and awarded Chuck the parties' unimproved lot. Finding that Allison had no debt, had received a larger share of the marital assets, and would have her own separate income and estate, the chancellor refused to award alimony. The chancellor also denied Allison's request for attorney's fees after finding she had the ability to pay them.

¶7. Chuck filed a subsequent motion to amend the chancellor's judgment as to the following: (1) the requirement that he pay expenses for the children in excess of child support (i.e., daycare costs, school tuition and fees, health insurance and uninsured medical costs, and life-insurance premiums); (2) the chancellor's decision to allow Allison to claim both children as dependents for tax purposes; and (3) the chancellor's acceptance of Allison's valuation of the unimproved lot. Although the chancellor amended his judgment to clarify that "school tuition" included "primary and secondary private[-]school tuition[,]" he otherwise denied Chuck's motion.

¶8. In 2015, Chuck filed a petition to modify the chancellor's May 9, 2013 opinion and final judgment. Chuck asserted a modification was justified because (1) his income had decreased; (2) he now supported the nine-month-old child he had with his girlfriend, Katie; (3) Allison had moved from Hattiesburg, Mississippi, to Baton Rouge, Louisiana, and

_____

adjusted gross income exceeds $100,000 or falls below $10,000.

4

enrolled the children in a more expensive private school; and (4) Allison's income had increased.[3] Chuck also asked the chancellor to sanction Allison for her failure to inform him of her address change, as required by Uniform Chancery Court Rule 8.06, and to communicate with him regarding the children's health, education, and extracurricular activities.

¶9.    Allison responded and filed a counter-complaint for modification and citation of contempt. According to Allison, Chuck "ha[d] willfully and contumaciously refused to abide by" the chancellor's order against having an unrelated overnight guest in the children's presence. Specifically, Allison alleged Chuck had: (1) moved in with his girlfriend, Katie; (2) fathered a child out of wedlock; and (3) taken the parties' children on vacations with Katie. Allison also claimed Chuck's increased income and the "increased needs and costs of raising the [now] older minor children" amounted to a substantial and material change in circumstances that justified an increase in Chuck's child-support obligation.

¶10.    Following a hearing on their motions, the parties entered into an agreement on September 19, 2016, to modify the chancellor's prior visitation order. On October 13, 2016, the chancellor entered an opinion and final judgment on contempt, modification, and the parties' other requested relief. In accordance with the 2013 amendment to section 43-19-101(4), the chancellor increased Chuck's monthly child-support payment to $1,026 (or twenty percent of Chuck's entire monthly adjusted gross income). The chancellor also dismissed Chuck's claim for contempt but granted Allison's contempt claim and awarded her

---

[3] Due to changes with her job in Hattiesburg, Allison had accepted a new job at a school in Baton Rouge.

$2,750 in attorney's fees related to the contempt proceedings.

¶11. Chuck filed a posttrial motion, which the chancellor partially granted. The chancellor amended his prior calculation of both the children's private-school tuition and fees and Allison's net monthly income. The chancellor further ordered the parties to equally divide the children's private-school and extracurricular expenses. After reviewing the parties' 2015 tax returns, the chancellor denied Chuck's request for a downward modification of his child-support obligation and upheld the award of attorney's fees to Allison. Aggrieved, Chuck appeals.

## DISCUSSION

### I. Whether the chancellor's order violated the statutory guidelines for child support.

¶12. In his May 9, 2013 opinion and final judgment, the chancellor noted that the parties' children attended daycare at a monthly cost of $1,030 and that their older son was preregistered to attend a private school with an annual tuition of $4,700, annual fees of $600, and an after-school rate of $8 an hour. The chancellor ordered Chuck to pay the children's monthly child-care expense of $1,030 until the parties' older son started attending private school, at which time Chuck was to pay $585 per month for the younger son's child care. The chancellor further ordered Chuck to pay sixty percent of the private-school tuition and fees, including extracurricular expenses.

¶13. In the October 13, 2016 order for modification, the chancellor increased Chuck's monthly child-support obligation to $1,026 (or twenty percent of Chuck's adjusted gross income). However, the chancellor denied Chuck's request to modify the provisions as to the

6

payment of daycare and school expenses and upheld his order that Chuck pay sixty percent of the private-school tuition and fees.[4] In response to Chuck's motion to reconsider, though, the chancellor modified his order so that the parties equally split the school and extracurricular expenses, and he acknowledged a slight error in his prior calculation of Allison's net income and the school fees.

¶14.    "[T]o justify the modification of the child[-]support provisions of a divorce decree, the moving party must show that there has been a material or substantial change in the circumstances of one of the parties." *Hopson v. Hopson*, 851 So. 2d 397, 400 (¶10) (Miss. Ct. App. 2003).  Affording the chancellor "broad discretion in the modification of child support, . . . we will reverse only when he is manifestly wrong in his finding of facts or has abused his discretion."  *Id.* (internal quotation mark omitted).  Here, the chancellor determined in his order for modification that "a number of changes in circumstances [had occurred] since the divorce" to warrant a modification of child support, including Allison's move to Baton Rouge to take a better job and to be closer to her family.  Neither party contests the chancellor's finding of a material change in circumstances.

### A.    Private-School Tuition and Fees

¶15.    Chuck contends the chancellor's order that he pay half the children's school tuition, in addition to child support, constitutes reversible error because the chancellor exceeded the statutory guidelines for child support.  Chuck alleges his ordered contributions would equal

---

[4] The chancellor noted that, as of June 2016, there was no longer any daycare expense for the parties' younger son.  Thus, the chancellor found moot Chuck's request to be relieved of paying for daycare.

$4,950 a year in addition to his existing monthly obligations.

¶16. The Mississippi Supreme Court has held that private-school tuition is considered part of child support. *Southerland v. Southerland*, 816 So. 2d 1004, 1006 (¶11) (Miss. 2002). Under section 43-19-101(1), the percentage of Chuck's adjusted gross income that should be awarded for the support of two children is twenty percent. Prior to the modification, Chuck was paying only twenty percent of the first $50,000 of his income, plus a sixty-percent share of the children's private-school tuition and fees.[5] Therefore, the chancellor's modified order that Chuck pay twenty percent of his adjusted gross income, plus fifty percent of the children's private-school tuition and expenses, does constitute an upward deviation of the statutory guidelines for child support. However, the modification was to Chuck's child-support obligation, not those additional contributions he was previously ordered to pay, and the chancellor later reduced the percentage of the extra contributions from sixty percent to fifty percent.

¶17. Allison raises no dispute that the chancellor deviated from the statutory guidelines, but she claims the chancellor satisfied the statutory requirements by making detailed findings to justify any deviation. Section 43-19-101(2) provides:

> The guidelines provided for in subsection (1) of this section apply unless the judicial or administrative body awarding or modifying the child[-]support award *makes a written finding or specific finding on the record that the application of the guidelines would be unjust or inappropriate in a particular case* as determined under the criteria specified in [s]ection 43-19-103.

(Emphasis added). The criteria specified in Mississippi Code Annotated section 43-19-103

---

[5] Chuck failed to timely appeal this order.

8

(Rev. 2015) include:

   (a)   Extraordinary medical, psychological, educational[,] or dental
         expenses.

   (b)   Independent income of the child.

   (c)   The payment of both child support and spousal support to the obligee.

   (d)   Seasonal variations in one or both parents' incomes or expenses.

   (e)   The age of the child, taking into account the greater needs of older
         children.

   (f)   Special needs that have traditionally been met within the family budget
         even though the fulfilling of those needs will cause the support to
         exceed the proposed guidelines.

   (g)   The particular shared parental arrangement, such as where the
         noncustodial parent spends a great deal of time with the children
         thereby reducing the financial expenditures incurred by the custodial
         parent, or the refusal of the noncustodial parent to become involved in
         the activities of the child, or giving due consideration to the custodial
         parent's homemaking services.

   (h)   Total available assets of the obligee, obligor[,] and the child.

   (i)   Payment by the obligee of child[-]care expenses in order that the
         obligee may seek or retain employment, or because of the disability of
         the obligee.

   (j)   Any other adjustment which is needed to achieve an equitable result
         which may include, but not be limited to, a reasonable and necessary
         existing expense or debt.

¶18.   The chancellor found that, when the parties lived in Hattiesburg, they agreed to enroll

the children in private school. Chuck disputes this finding. He claims he was opposed to

sending the children to private school and should therefore not be required to contribute

9

toward the tuition costs.[6] Our supreme court has previously stated that, "even where parents agree to send children to private school, support awards made in consideration of this expense must also be reasonable in light of both parents' financial means." *Southerland*, 816 So. 2d at 1006 (¶11). Here, however, the chancellor did not base his determination solely on his finding that the parties had agreed to send their children to private school. The chancellor also conducted a thorough analysis of the elements enumerated in *Adams v. Adams*, 467 So. 2d 211, 215 (Miss. 1985), as potentially "supportive" of a financial modification of a child-support decree. The elements addressed by the chancellor included: (1) the increased needs arising from the children's advanced age and maturity; (2) an increase in expenses; (3) the inflation factor; (4) the parties' relative financial conditions and earning capacities; (5) the children's physical and psychological health and special medical needs; (6) the parties' health and special medical needs; (7) the paying party's necessary living expenses; (8) the estimated amount of income taxes the respective parties must pay on their incomes; (9) the free use of a residence, furnishings, and automobile; and (10) any other factors and circumstances that bear on the support subject shown by the evidence. *Id*.

¶19.    With regard to the children's ages, an increase in expenses, and their health and special needs, the chancellor noted the following: (1) the children were now older; (2) the younger son would soon attend school with his older brother and no longer need daycare; (3) they would "cost more to rear and support"; and (4) both children were in speech therapy, with those expenses covered under Chuck's medical insurance.

---

[6] The chancellor's order for Chuck to contribute to private-school tuition was in the original opinion and final judgment, which Chuck failed to properly appeal.

¶20. The chancellor also made detailed findings concerning the parties' financial conditions and earning capacities and concluded that, although Chuck's net monthly income had decreased and Allison's net income had increased, Chuck still had "a significantly higher monthly income than . . . Allison."[7] In considering both parties' lifestyles post-divorce, the chancellor commented that Chuck was now married to Katie and paying for their child's care. Further observing that Chuck had "enjoyed more social activities, time, travel, and expense, than has Allison," the chancellor noted Chuck had spent money gambling at casinos and traveling with Katie.

¶21. The chancellor analyzed the cost difference between the schools in Hattiesburg and Baton Rouge, and ultimately, he based his decision on the children's best interest. In so doing, the chancellor stated:

> In considering the private[-]school expense for [the children], and the differences presented in what the costs would be if the boys were still at Sacred Heart in Hattiesburg as opposed to Our Lady of Mercy in Baton Rouge, the [c]ourt finds that the best interests of [the children] must continue to prevail as the primary consideration in the educational costs and needs for their support.

¶22. We find no abuse of discretion in the chancellor's findings. In *McEachern v. McEachern*, 605 So. 2d 809, 814 (Miss. 1992), the supreme court held: "When entering a child[-]support decree, the chancellor should consider all circumstances relevant to the needs of the children and the capacities of the parents. The reasonable needs of the children are

---

[7] The chancellor determined that Chuck's net monthly income at that time was $5,669, compared to $5,772 at the time of the divorce trial, and that Allison's net monthly income had increased from $3,353 to $4,206.90. Chuck raises no dispute as to the chancellor's calculation of his income.

obviously the beginning point in such inquiry." *See also Adams*, 467 So. 2d at 215 ("The underlying principle regarding child support is the legal duty owed by the parents to the child for the child's maintenance *and best interests*." (Emphasis added)); *Tedford v. Dempsey*, 437 So. 2d 410, 417 (Miss. 1983) (holding that, in matters involving the modification of child support "the best interests of the children are[,] as always[,] our touchstone"). Allison testified that the boys loved their new school and were "thriving." Because her family attends Our Lady of Mercy church and the boys' cousins attend the same school, she testified the children have a good support system in Baton Rouge. She also testified that, when the children begin high school, her job at St. Joseph's could afford them a tuition discount.[8]

### B. Calculation of Allison's Net Monthly Income in Determining the Parties' Financial Obligations

¶23. Although Chuck does not expressly challenge the chancellor's calculation of his net income and the modification of his monthly child-support obligation to $1,026, he contends the chancellor erred in his calculation of Allison's net income. The chancellor determined that Allison's net monthly income had increased from $3,353 to $4,206.90 (as reported in her Uniform Chancery Court Rule 8.05 financial declaration). In the amended order, the chancellor allowed the parties to submit their 2015 tax returns, and Allison's net monthly income was recalculated as $4,534. Chuck argues that Allison's net monthly income should have been $5,442.28 because she received approximately $9,000 in 2015 federal and state

---

[8] In the order for modification, the chancellor erroneously stated that Allison's employee discount would afford a tuition discount at Our Lady of Mercy. The chancellor corrected this finding in his subsequent order and decreased Chuck's contribution to the children's tuition and expenses to fifty percent.

tax refunds. Chuck asserts that the chancellor ignored Allison's tax withholdings, which he claims "distorted her actual monthly income," and that this "manifest error" resulted "in a lopsided analysis of obligations."

¶24. In calculating adjusted gross income for support purposes, section 43-19-101(3)(b) requires the court to subtract the following legal deductions:

> (i) Federal, state[,] and local taxes. Contributions to the payment of taxes over and beyond the actual liability for the taxable year shall not be considered a mandatory deduction;
>
> (ii) Social [S]ecurity contributions;
>
> (iii) Retirement and disability contributions except any voluntary retirement and disability contributions[.]

In the order for modification, the chancellor considered "the financial declarations and tax returns of the parties in evidence and that each has received [f]ederal and [s]tate income tax refunds, and/or anticipates such, for each year including the year of their divorce, 2013." The chancellor later reviewed the parties' 2015 tax returns and found that the recalculated net-monthly incomes did not "warrant amendment" of his order for modification "as to Chuck's monthly child[-]support obligation."[9] In determining the parties' support obligations, we find the chancellor made an accurate and thorough analysis of the evidence.

¶25. Regarding Allison's 2015 tax return, we note that Allison deducted $4,705 in moving expenses, which would be a one-time, nonrecurring credit. She also received tax credits for claiming the children as dependents, which is in accordance with the chancellor's order.

---

[9] The chancellor noted he could not include any deductions for Allison for Social Security or Medicare because she submitted no W-2 or pay stubs into evidence.

Furthermore, Allison's Rule 8.05 financial declaration indicated that her expenses left her with a monthly deficit of $1,216.02 (over $14,000 annually). Even if Allison had decreased her withholding to eliminate any tax refund, she still would have been left with a deficit. Chuck challenges neither Allison's monthly expenses nor the chancellor's finding that Chuck spent more on leisure activities. Thus, we cannot find that Allison's refund should have any effect on Chuck's financial obligations.

¶26. Accordingly, we conclude the chancellor made sufficiently detailed findings to warrant the upward deviation from the child-support guidelines. Furthermore, the chancellor granted a slight modification to Chuck's contribution—from sixty percent to fifty percent—based on his recalculation of Allison's income and the school's tuition and fees. We therefore find this issue lacks merit.

> **II.   Whether the chancellor improperly denied Chuck's request to modify his obligation to pay his children's health-insurance premiums.**

¶27. Chuck next challenges the chancellor's denial of his "request for a credit against the monthly child[-]support obligation in the amount of insurance premiums paid on behalf of [the children]."

¶28. In relevant part, Mississippi Code Annotated section 93-5-23 (Rev. 2013) provides:

> [T]he court may[,] at its discretion, having regard to the circumstances of the parties and the nature of the case, as may seem equitable and just, make all orders touching the care, custody[,] and maintenance of the children of the marriage. . . . [W]here proof shows that both parents have separate incomes or estates, the court may require that each parent contribute to the support and maintenance of the children of the marriage in proportion to the relative financial ability of each. In the event a legally responsible parent has health insurance available to him or her through an employer or organization that may

14

extend benefits to the dependents of such parent, any order of support issued against such parent may require him or her to exercise the option of additional coverage in favor of such children as he or she is legally responsible to support.

Mississippi Code Annotated section 93-11-65(1)(a) (Rev. 2015) also confers jurisdiction with the chancery court "to entertain suits for the custody, care, support[,] and maintenance of minor children and to hear and determine all such matters."

¶29. In *Nichols v. Tedder*, 547 So. 2d 766, 769 (Miss. 1989), the supreme court held:

> In the context of child[-]care and maintenance orders, regular child support refers to the sums of money which the particular parent is ordered to pay for the child's basic, necessary living expenses, namely food, clothing, and shelter. . . . Still other items [that] may properly be awarded pursuant to a valid child[-]care and maintenance order are health[-]related expenses such as reasonable and necessary medical, dental, optical, and psychiatric/ psychological expenses. A parent *can also be required to absorb insurance expenses such as maintaining medical and hospitalization insurance on the child*, and maintaining a life[-]insurance policy on his/her own life with the child named as beneficiary.

(Emphasis added and citations omitted).

¶30. We find no abuse of discretion in the chancellor's denial of Chuck's request to credit his child-support payments in the amount of the children's health-insurance premiums. Additionally, in calculating Chuck's adjusted gross income for purposes of child support, the chancellor allowed for a health-insurance tax deduction. Thus, this issue lacks merit.

### III. Whether Chuck should have been allowed to claim one of his minor children on his tax return.

¶31. Because Allison had primary physical custody of the children, the chancellor held she could claim both as dependents on her tax returns. In his petition for modification, Chuck unsuccessfully requested that the chancellor allow him to claim one of the children as a

dependent for state and federal tax purposes.

¶32. In *Nichols*, our supreme court determined a chancellor has the discretion to award to a noncustodial parent when necessary the right to claim tax exemptions for dependent children, especially where the custodial parent waives the right to that exemption. *Nichols*, 547 So. 2d at 771. However, "[w]hen the request to transfer a tax exemption is pursuant to a request to modify a prior decree, a material and adverse change in circumstances must occur to transfer to one parent a tax exemption that was previously awarded to the other parent." *Neelly v. Neelly*, 213 So. 3d 539, 542-43 (¶10) (Miss. Ct. App. 2016). We find Chuck alleged no material change in circumstances to warrant modification of the tax exemption. Instead, he merely asserted that he "simply wanted a modest break on his taxes . . . to offset growing costs." In addition, as the chancellor noted, Chuck had another minor child he could claim as a dependent, and his new wife, Katie, was expecting their second child. Therefore, we find no error in the chancellor's denial of Chuck's request to modify which parent could claim the parties' children as a dependent on their tax returns.

**IV.    Whether the chancellor erred in dismissing Chuck's claim for civil contempt against Allison.**

¶33. Chuck brought a civil-contempt claim against Allison. The chancellor dismissed the claim with prejudice after finding Chuck's evidence "in support of his contempt claims [did] not rise to the level of preponderance of the evidence." On appeal, Chuck argues Allison knowingly violated the chancellor's judgment by failing to inform him that she had moved to Baton Rouge and enrolled the children in a new private school. Chuck claims Allison also failed to inform him of the children's doctor visits, specifically citing one instance when

16

Allison waited three hours to contact him after she had taken their younger son to the emergency room (ER).

¶34. "The primary purpose of a civil-contempt order is to enforce compliance with a court order." *Stallings v. Allen*, 201 So. 3d 500, 504 (¶14) (Miss. Ct. App. 2016). The "[f]ailure to comply with a court order is prima facie evidence of contempt." *Vincent v. Rickman*, 239 So. 3d 501, 504 (¶13) (Miss. Ct. App. 2017) (quoting *Evans v. Evans*, 75 So. 3d 1083, 1087 (¶14) (Miss. Ct. App. 2011)). A chancellor's determination of contempt is "fact specific" and left to his discretion. *Id.* This Court will not interfere with a chancellor's findings unless the chancellor was "manifestly wrong or clearly erroneous, or applied an erroneous legal standard." *Id*. at 504-05 (¶13).

¶35. Although Chuck claimed Allison violated Rule 8.06 by failing to notify him of her change of address, the chancellor noted Chuck's admission that he knew where Allison and the boys were living and that there had been no visitation issues since she moved to Baton Rouge. We therefore find the record supports the chancellor's findings.

¶36. With regard to Allison's alleged failure to apprise Chuck of the children's doctor visits, the chancellor's order required the parties to "notify the other if any emergency occurs with the children such that medical treatment is sought." When discussing the younger son's trip to the ER, Allison admitted she should have immediately contacted Chuck upon her arrival at the ER. Allison provided the following reason for waiting three hours:

> [T]his was right after we had been in court in [November 2013] where a lot of things had come out. Chuck had said he was going to drive to Baton Rouge and shoot my father in the head, and things were not going well with us, and so I wanted . . . to make sure that something was really wrong with [our son],

17

and I know now that I will not make that mistake again.

. . . .

> I mean, [Chuck] has even literally told me—when I explained about my new job—I won't say the word, but I hate your F'ing guts. You know, I mean there is really—it is not a question about does he hate me. He expresses it a lot, in text message[s], e-mails[,] and verbally. And I am afraid of him[,] . . . [w]hich makes it difficult to turn to somebody in unpredictable situations.[10]

Allison even felt the need to have Chuck's mother and sister come to the ER to diffuse any conflict between them.

¶37. We find no abuse of discretion in the chancellor's determination that Chuck failed to establish a prima facie case of contempt against Allison. The court-ordered provision simply required Allison to notify Chuck if an emergency occurred; it did not indicate any specified time frame for the notification. Allison only waited three hours to inform Chuck that their son was in the ER, and she contacted him when she knew their son's medical diagnosis. Chuck also acknowledged that Allison sent him text messages if one child was sick or had to miss school. We therefore find this issue lacks merit.

### V.     Whether the chancellor erred in finding Chuck in contempt.

¶38. The chancellor found that Allison established a prima facie case for civil contempt against Chuck by showing that he willfully, knowingly, and deliberately violated the morality provision contained in the May 9, 2013 opinion and final judgment. The chancellor further found that Chuck failed to present clear and convincing evidence of a defense for his conduct. As noted, we review civil-contempt orders for manifest error. *Hanshaw v.*

---

[10] Chuck explained that the chancellor had instructed the parties to communicate only through texts, emails, and social media, indicating the ongoing strife between them.

18

*Hanshaw*, 55 So. 3d 143, 147 (¶13) (Miss. 2011). A chancellor is afforded "wide discretion in 'exerting his coercive powers to enforce his decrees.'" *Id.* (quoting *Matthews v. Matthews*, 227 Miss. 358, 360, 86 So. 2d 462, 462 (1956)).

¶39. In his May 9, 2013 opinion and final judgment, the chancellor included a morality provision that prohibited both parties from having "*overnight guests* of the opposite sex not related by blood or marriage in the presence of the minor children." (Emphasis added). Although Allison asserts Chuck violated this provision by living with Katie, Chuck contends he did not because Katie was not an "overnight guest." Even though Chuck married Katie, which prevented him from being in future contempt of the chancellor's order, the chancellor concluded that Chuck, nonetheless, "willfully, deliberately, knowingly[,] and intentionally" violated the terms of the order to the "children's detriment."

¶40. In relevant part, the Concise Oxford American Dictionary defines a "guest" as (1) "a person who is invited to visit the home of or take part in a function organized by another[,]" and (2) "a person lodging at a hotel or boardinghouse[.]" Concise Oxford American Dictionary 398 (Erin McKean ed., 2006).[11] Based on such a definition and the facts of this case, we find Katie was not Chuck's overnight guest.

¶41. Chuck and Katie purchased a home together in September 2014. They had a daughter together in October 2014 and then married in April 2016. When asked about the morality clause at the trial in July 2016, Chuck offered the following testimony: "[T]he morality clause talks about overnight guests[,] and . . . she is not a guest. . . . [W]e are in a committed

---

[11] Black's Law Dictionary, Merriam-Webster, and the American Heritage College Dictionary all provide a substantially similar definition of a "guest."

relationship. We are married. We have a family together. She was not living at my place . . . because we bought a home together. I didn't consider her . . . a guest."

¶42. Allison herself acknowledged that, "when Chuck moved from his parents' home to the home that he and Katie now share, that was . . . right before the baby was born. I knew that he was moving . . . ." That was because, in June 2014, Chuck advised Allison that he and Katie intended to move in together prior to the birth of their new child.[12] When Allison raised the morality clause, Chuck informed her then that he did not interpret Katie to be a "guest" under the morality clause, and he stated they could argue to the chancellor the meaning of a "guest."

¶43. The chancellor's original opinion and final judgment is a legal text, and when questions of meaning arise, answers are sought by "the same rules of construction which appertain to other legal documents." *Estate of Stamper v. Edwards*, 607 So. 2d 1141, 1145 (Miss. 1992). "Courts must give the prior decree the most coherent and principled reading its words will bear." *Id.* The words of the text itself are the most credible source for what was intended. *Cooper v. Crabb*, 587 So. 2d 236, 241 (Miss. 1991). As such, we must look to "the meaning of the language used, not the ascertainment of some possible but unexpressed intent . . . ." *Cherry v. Anthony, Gibbs, Sage*, 501 So. 2d 416, 419 (Miss. 1987).

¶44. In his original opinion and final judgment, the chancellor chose to use the words "overnight guest" when restricting who could stay overnight in the presence of the children.

---

[12] The morality clause also provided that "[b]oth parties agree to inform each other prior to introducing the minor children to anyone with whom they are romantically involved."

20

Indeed, our own caselaw delineates between "cohabitation" and "overnight guest." *Bresnahan v. Bresnahan*, 818 So. 2d 1113, 1120 (¶18) (Miss. 2002) ("There can be many situations involving overnight guests which do not rise to the level of cohabitation . . . ."); *Ellis v. Ellis*, 651 So. 2d 1068, 1072 (Miss. 1995) (finding the record unclear as to whether the ex-wife cohabited with another man even though he was a frequent overnight guest). Based upon the foregoing, Katie was clearly not Chuck's "overnight guest." We therefore find the chancellor manifestly erred by holding Chuck in contempt. As a result, we reverse and render that portion of the chancellor's judgment.

### VI. Whether Allison should be awarded attorney's fees.

¶45. Allison contends this Court should award her attorney's fees related to this appeal. She asserts that she does not know how her fees "will get fully paid" and contends that the fees "are an extreme hardship, daunting[,] and unnecessary." Chuck argues that Allison is not entitled to attorney's fees because she has not proven an inability to pay.

¶46. Allison was awarded $2,750 in attorney's fees related to the contempt proceedings against Chuck. Because we find the chancellor erred by holding Chuck in contempt, we vacate the chancellor's award of attorney's fees to Allison related to the contempt proceedings. In addition, because Allison has failed to prove an inability to pay, we further decline to award her attorney's fees related to this appeal.

### CONCLUSION

¶47. We reverse and render the portion of the chancellor's judgment finding Chuck in contempt of the morality provision contained in the original opinion and final judgment, and

21

we vacate the award to Allison of attorney's fees related to the contempt proceedings against Chuck. As to all other issues raised on appeal, we affirm the chancellor's judgment.

¶48. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART; AND VACATED IN PART.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., CARLTON, FAIR AND WILSON, JJ., CONCUR. WESTBROOKS, J., CONCURS IN PART AND IN THE RESULT WITH SEPARATE WRITTEN OPINION, JOINED IN PART BY FAIR AND TINDELL, JJ. BARNES, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY GREENLEE, J. GREENLEE, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION**.

**WESTBROOKS, J., CONCURRING IN PART AND IN RESULT:**

¶49. *Riddick v. Riddick*, 906 So. 2d 813 (Miss. Ct. App. 2004), seems to have dealt with the same circumstances in this case. It is a 2004 Court of Appeals case where this Court agreed with the chancellor who opted not to find the ex-wife in contempt for violating the morals clause although she had technically violated it. It is my opinion that the majority is consistent with *Riddick*. I believe that Chuck technically violated the morality clause by living with Katie, but he should not have been held in contempt. I agree with the majority that the chancellor erred by holding Chuck in contempt because the record does not show that there was an adverse effect on the boys. The record reflects that the youngest son came home and reiterated what his dad and Katie told them—that they were getting married in two weeks. Allison chose to explain that people can have children when they are not married—which could mean that she was upset about adjusting her parenting versus the relationship having an adverse effect on the boys. At the time of the hearing, Katie and Chuck were engaged and shared an 18-month-old child. The pictures provided in the record

show two boys happily interacting with their sibling and seemingly adjusting to a blended family that included Katie. Accordingly, I see no legitimate purpose or benefit in holding Chuck in contempt. *Id.* at 824 (¶37) ("This Court can see no benefit in rendering a judgment of contempt against the alleged contemnor, even though it would be appropriate under the law."). For these reasons, I concur in part and in the result.

**FAIR AND TINDELL, JJ., JOIN THIS OPINION IN PART.**

**BARNES, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶50. I dissent from the majority's determination that Katie could not be classified as an overnight "guest" because she and Chuck purchased their house together. The provision, as read by the majority, is neither "coherent" nor "principled." *See Estate of Stamper v. Edwards*, 607 So. 2d 1144, 1145 (Miss. 1992).

¶51. The majority's emphasis on the term "guest" renders a portion of the remaining provision meaningless. If the person staying overnight is related to the parent "by marriage," he or she most probably would not be a "guest" in the home. Therefore, under the majority's interpretation, the phrase "not related by . . . marriage" is superfluous.

¶52. Further, as only "guests" are prohibited under the majority's analysis, Chuck would not have been in contempt of the order had he hired a prostitute to spend the night with the children present. She would, of course, have been an "invitee" rather than a "guest."[13]

¶53. I submit that the true focus and "principle" of the provision is to prevent the parties from engaging in improper behavior in the presence of the children. The parties agreed to

---

[13] *See Evans v. Hodge*, 2 So. 3d 683, 686 (¶6) (Miss. Ct. App. 2008) ("Social guests are licensees. Business visitors are invitees." (Citations omitted)).

23

the provision in the temporary order, and the chancery court incorporated the provision into the final order, which was not appealed. The majority has not explained how Katie's status as a co-owner of the house affects the propriety of the situation.

¶54. Chuck freely admitted that he and Katie—members of the "opposite sex not related by blood or marriage"—spent the night together in the children's presence. Additionally, as Allison argues, the "court found Chuck's blatant violation to have had a negative impact on the children as [she] was forced to explain mature issues to the children." When her son informed Allison that Katie was pregnant, Allison testified that she had to explain to him (aged seven at the time of trial and educated in parochial school), "that sometimes people can have a baby when they are not married."[14] Confronted by Allison about the morality provision, Chuck responded: "Deal with it. . . . I'm doing it."

¶55. The chancery court dealt with it, and I would affirm.

**GREENLEE, J., JOINS THIS OPINION.**

---

[14] *See Morrow v Morrow*, 591 So. 2d 829, 833 (Miss. 1991) (finding no error in chancery court's modification of divorce decree, restricting the mother's visitation with her child in the presence "of any male to whom she is not married or to whom she is not related," as the court observed that the "seven year old child was unable, with her present lack of maturity and understanding, to evaluate the import of her mother's action[,]" i.e., her "'illicit' relationship with her male friend while her daughter reside[d] with her").

24