# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-00804-COA

**SAMUEL WEATHERLY**                                                                 **APPELLANT**

**v.**

**BRANDY WEATHERLY**                                                                 **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 07/12/2022 |
| TRIAL JUDGE: | HON. CARTER O. BISE |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | PATRICK TAYLOR GUILD |
| ATTORNEYS FOR APPELLEE: | JOE SAM OWEN |
| | ASHLEY W. GUNN |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 05/07/2024 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     Sam and Brandy Weatherly were married and had one child, E.W.[1]  Sam and Brandy divorced on March 15, 2022.  As part of the parties' divorce decree, the chancellor awarded both parties joint custody of E.W. with sole physical custody to Brandy and ordered Sam to pay child support.  Additionally, the chancellor made an equitable distribution of the marital assets to each party.  Sam appeals and argues that the chancellor erred (1) by awarding sole physical custody of E.W. to Brandy, (2) in setting the amount of child support payments to Brandy, (3) in making its marital property and equitable distribution analysis, (4) by not

---

[1] This child was a minor during the events at issue, so we will refer to him as "E.W." for privacy throughout this opinion.

awarding him alimony, and (5) by not awarding him attorney's fees. Finding no error, we affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

¶2. Sam and Brandy married on October 2, 2010. At the time of their marriage, both parties lived and worked in Atlanta, Georgia. Brandy was employed in medical sales by Cytyc, which later became Hologic and made an annual salary of approximately $300,000.00.[2] Brandy testified this job required 20-25% overnight travel. Sam was a private investigator and made an annual salary of approximately $35,000-$38,000 between the years 2007 and 2011. It is undisputed that a large income disparity existed between the parties throughout their marriage. In 2011, Sam and Brandy moved to Kiln, Mississippi to be closer to Brandy's mother, Pam Ratliff.[3] Sam testified there was less demand for private investigators in Mississippi, so his income decreased as a result of the move.

¶3. In 2013, E.W. was born, and Brandy's mother, Pam, became E.W.'s full-time babysitter while the parties worked. In 2016, Brandy, Sam, and E.W. moved to Pass Christian into their marital home.[4] That same year, after a disagreement, Pam ended her role

---

[2] At the time of trial, Brandy had been employed by Hologic for twenty years and was promoted to "regional sales manager."

[3] Pam resided in Diamondhead at the time.

[4] The marital home was built on land that was purchased, according to Brandy, by a loan from Brandy's father, Richard. The relevant details of that loan will be discussed later in this opinion.

as E.W.'s nanny.[5]  Sam testified that as a result, he was required to take on the responsibility of caring for E.W., and his income drastically reduced.  Brandy testified Sam "contributed very little" to the marriage financially and expressed frustration throughout the marriage as to this disparity.  According to Brandy, the marriage had become a "loveless" one.

¶4.    In September 2019, Brandy began having an affair with Cody Chapman, who resided in Arkansas.[6]  Sam discovered the affair shortly after it started.  At the time of trial, Brandy and Cody were still dating, but Brandy testified that she and Cody had "no plans to get married." On September 23, 2019, Sam and Brandy constructively separated.[7]  On October 14, 2019, Brandy's father, Richard, passed away.[8]  Brandy subsequently became the administrator and one of the beneficiaries of his estate.  On May 15, 2020, Sam filed a petition for divorce on the grounds of adultery, habitual cruel and inhuman treatment, or irreconcilable differences pursuant to Mississippi Code Annotated section 93-5-1 (Rev. 2018).  On May 15, 2020, Sam filed a motion for temporary relief and  asked for temporary full legal and physical custody of E.W.  On June 3, 2020, Brandy filed her own motion for temporary relief and asked for temporary full legal and physical custody of E.W.

---

[5]    This disagreement resulted after Pam witnessed Sam "whipping" E.W. as a disciplinary measure.  An email from Pam to Brandy detailing the encounter was entered into evidence at trial.  Ultimately, Pam and the parties agreed that Pam would no longer serve as E.W.'s nanny,

[6]  Cody was previously married to Brandy's first cousin.

[7]  Although the parties were separated, Sam remained in the marital home until the court entered its temporary order in November 2020.

[8]  Richard was murdered in Pine Bluff, Arkansas, where he resided.

¶5.     On November 18, 2020, a hearing on the parties' motions for temporary relief was held. On November 20, 2020, after considering all of the evidence, the court ordered joint legal custody of E.W. with sole physical custody to Brandy. Sam was awarded standard visitation with E.W. as well as additional visitation during any period of time that Brandy was out of town for a work obligation. The court awarded temporary use and possession of the marital home to Brandy and ordered Sam to vacate the home by November 24, 2020. The temporary order further ordered Brandy to pay $2,500.00 per month to Sam in temporary alimony.[9]

¶6.     On November 30, 2020, Sam filed a motion for reconsideration and asserted that the court's temporary order was against the overwhelming weight of the evidence. On February 10, 2021, a hearing on Sam's motion for reconsideration took place. On February 24, 2021, the court entered an order denying the motion. On June 3, 2021, Sam filed a motion to modify the temporary order, which was heard on June 28, 2021.[10]

¶7.     On November 8, 9, 10, 12, 17, 18, and 22, 2021, a seven-day trial took place. Sam called Brandy to testify. Brandy testified that she and Sam were married in 2010. Brandy

---

[9] It is unclear exactly how much Sam received in temporary alimony, but we will assume that Brandy's monthly payments continued until the final judgment was entered on July 12, 2022.

[10] Sam's motion for modification requested "additional holiday visitation, to include Fourth of July, Labor Day, Thanksgiving, and Christmas for 2021" as well as summer visitation. The court awarded Sam summer visitation from July 9-19, 2021, and August 2-8, 2021, as well as Thanksgiving visitation from the day E.W. was released from school for the Thanksgiving holidays until the Friday after Thanksgiving at 10:00 a.m. The court also heard Sam's motion to re-open discovery, for appraisal of real property, for scheduling order, and for continuance.

testified that a disparity in income between her and Sam was a continuous source of tension in the marriage and started "before [E.W.] was born." After experiencing fertility issues, Brandy conceived E.W. with the assistance of IVF.[11] Brandy described E.W. as her "biggest blessing." She testified that Sam kept promising her that he would "contribute to [their] family" financially, but it "never happened." She testified that ultimately she and Sam merely "coexisted" in a "loveless marriage."[12] Brandy would often come home "after working all day" to Sam playing video games. She stated Sam "knew how stressed out [she] was with working [her]self literally to death, and he wouldn't do anything about it." Brandy admitted that in September 2019, she had an affair with Cody.[13] Sam discovered the affair "the very next day" and Sam and Brandy constructively separated, though Sam remained in the marital home "despite how tense the house was."[14] Brandy testified E.W. has "never been around" Cody since Brandy and Cody started dating, and she has no plans of marrying him.[15]

¶8. Brandy testified that in October 2019, her father, Richard, was murdered. After his

---

[11] IVF stands for in vitro fertilization.

[12] Brandy testified that at the time of Brandy's affair, they "had not had any sexual relationship in over 14 months." However, Sam testified it had only been "approximately 8 months."

[13] Messages between Cody and Brandy were admitted into evidence.

[14] Sam remained in the marital home until the court entered its temporary order in November 2020.

[15] Brandy testified E.W. had been around Cody before the start of the relationship because Cody was previously married to Brandy's first cousin.

death, she became the executrix and 40%-beneficiary of his estate.[16] Brandy received an early distribution from the estate of $41,000. Additionally, she received a life insurance check for $100,358.00 [17] Brandy testified she had an apartment in Arkansas, paid for by Richard's estate, where she stayed while attending to estate matters.[18]

¶9. Brandy testified she "paid the financial burden for [her] family for years," with Sam paying approximately "$7,000" toward the family finances between January 2018 and the date of the November 2021 trial. Brandy's Rule 8.05 financial statement indicated that in 2021, she made a "gross monthly income" of "$20,937.75."[19] Sam's Rule 8.05 financial statement indicated that in 2021, he made a net monthly income of "$1,952.54" working for Lemieux and Associates LLC and "$1,438.92[,]" minus expenses, for his self-employment with Weatherly Investigations LLC. Both parties' Rule 8.05 financial statements were admitted into evidence.

¶10. Sam called Jonathan Malley, a neighbor of Sam and Brandy, who testified that the parties would regularly attend social gatherings at their home. Sam called Dustin Hebert, another neighbor. The relevant portions of this testimony will be discussed in more detail in the analysis.

---

[16] Her stepmother, Rita Ratliff, was a 50% beneficiary, and E.W. was a 10% beneficiary.

[17] The life insurance policy was actually for $200,000, but Brandy instructed the policyholder to split the check with her stepmother, Rita.

[18] On the date of trial, Richard's estate had not yet been "settled."

[19] *See* UCCR 8.05. Brandy testified she is paid both in salary and in commissions and bonuses, so her exact monthly income varies.

¶11.    Sam was called to testify.  Sam testified that he worked as a private investigator from the time he was eighteen years old.  He testified he attended college but never earned a degree.  At the time of his marriage to Brandy in 2010, Sam was making an average annual income of $35,000-$38,000.   When the parties decided to move to Mississippi, Sam explained to Brandy that his income would decrease due to less demand. Shortly after the move in 2011, Sam started his own company, Weatherly Investigations LLC, but also worked for Contego Investigative Services.  Sam testified that his income did decrease, but it continued to grow with time; in 2016, Sam made $51,593.60—the "most [he] ever made." In 2016, after Pam ended her role as E.W.'s babysitter, Sam had to take on more of the caregiving responsibilities and his income decreased "a significant amount."  Specifically, in 2017, Sam's annual income decreased to $3,470.  Sam explained this decrease was due to his "lack of availability." Sam testified that Brandy never expressed concerns to him regarding his employment or income.  Attached to Sam's Rule 8.05 financial statement, which was admitted into evidence, was an appraisal report on the marital home dated September 5, 2021.  This report valued the marital home at $975,000.00.[20]

¶12.    On cross-examination, Sam confirmed that he contributed $18,158.27 to the marriage between the six-year period of 2015 to 2020.  This averaged out to around $3,000 a year. The checks evincing these payments were entered into evidence. [21]  Sam confirmed that the

[20]  This is the appraisal value the court ultimately accepted in its equitable distribution analysis.

[21]  These checks, which were paid from Sam to Brandy, were the only documentation in the record of Sam's contributions to the marriage.

household expenses during this same time frame were approximately $136,489.44 a year. Sam testified there were other expenses he paid for directly from his "business checking account," but he never provided documentation as to these exact figures.

¶13. Brandy also called her mother, Pam Ratliff, who testified as to an incident where Sam spanked E.W. in an "extremely harsh" manner. Pam and Brandy exchanged emails following the encounter, and those emails were entered into evidence. Pam testified that it was this incident that led to her ending her employment as E.W.'s full-time babysitter.

¶14. Allen Purvis was called to testify. Allen was accepted as a certified residential appraiser. Allen testified he conducted an appraisal on the marital home on September 8, 2021, and prepared an appraisal report. According to this report, Allen opined that the fair market value of the marital home was $715,000. The appraisal report was admitted into evidence.[22]

¶15. On January 7, 2022, the court entered an order to supplement the record to allow the parties to provide additional discovery.[23] On March 15, 2022, the court entered its final judgment and granted Sam a divorce from Brandy on the ground of adultery under Mississippi Code Annotated section 93-5-1. The court ordered that "the parties should have

---

[22] Ultimately, the court accepted Sam's appraisal of the home dated September 5, 2021 which was entered with his Rule 8.05 financial statement. This appraisal valued the home at $975,000.00.

[23] The court ordered the production of the following documents: (1) the HUD-1 settlement statement from the purchase of the marital home, (2) a statement from the mortgage lender for the marital home, (3) a statement from Hologic, Inc. indicating the balance of Brandy's retirement account at the time of the parties' marriage on October 2, 2010.

joint legal custody, with Brandy having physical custody of E.W., with [standard] visitation awarded to Sam." The court found that Sam's average monthly adjusted gross income was $3,391.46 and "appl[ied] the statutory amount of 14 percent for one child" and ordered Sam to pay "$479.90 per month[.]" The court further ordered Brandy to pay two-thirds of E.W.'s private school tuition with Sam paying the other one-third. Additionally, the court conducted an equitable distribution analysis and awarded Brandy $356,040.78 in marital assets and awarded Sam $504,017.15 in marital assets to "eliminate the need for Brandy to make alimony payments of any sort." The court did not award Sam his attorney's fees.

¶16. On March 25, 2022, Sam filed a motion under Mississippi Rule of Civil Procedure 59 to alter or amend the judgment and for other relief.[24] On May 11, 2022, a hearing was held on the motion. On July 12, 2022, the court entered its amended final judgment, denying in part and granting in part Sam's Rule 59 motion. Accordingly, the final judgment provided the following:

> The [c]ourt took the plaintiff's Rule 59 [m]otion under careful consideration, and must note, as is done throughout the [j]udgment, that the credibility of the witnesseses and soundness of the evidence is weighed by the [c]ourt when arriving at its conclusions.
>
> In order to grant a Rule 59 [m]otion, the [c]ourt must find an intervening change in law, availability of new evidence, or a clear error of law to prevent manifest injustice. As it relates to the property division, the [c]ourt finds that among the voluminous exhibits and seven days of testimony, there are certain marital and non-marital assets that should [be] reclassified and redistributed to prevent an unjustice, and the reasoning for same is detailed below.

---

[24] The issues presented in Sam's Rule 59 motion were largely duplicative of the issues he now asserts on appeal. We will only discuss the Rule 59 motion as it relates to the relevant issues in this opinion.

9

The court incorporated and re-stated its prior judgment and noted the changes in italics. Further discussion of the relevant changes will occur in the analysis below.[25]

¶17. Sam now appeals, asserting the chancellor abused his discretion (1) by awarding sole physical custody of E.W. to Brandy, (2) in calculating Sam's child support obligation (3) in determining the equity in the marital home, (4) in determining the marital value of Brandy's retirement account, (5) in finding the 2005 Chevy Silverado was Brandy's separate property, (6) in failing to find the boat was Sam's separate property, (7) in awarding personal property to Brandy without considering their value in its equitable distribution analysis, (8) in failing to award Sam alimony, and (9) in failing to award Sam his attorney's fees. We have condensed these issues into five main topics.

**STANDARD OF REVIEW**

¶18. In domestic relations cases, our standard of review is limited. *May v. May*, 107 So. 3d 1052, 1053 (¶4) (Miss. Ct. App. 2013) (citing *In re Dissolution of Marriage of Wood*, 35 So. 3d 507, 512 (¶8) (Miss. 2010)). The findings of the chancellor "will not be disturbed unless [they are] manifestly wrong or clearly erroneous." *Id*. at 1054 (¶4) (citing *Lowrey v. Lowrey*, 25 So. 3d 274, 285 (¶26) (Miss. 2009)). "So long as there is substantial evidence in the record that, if found credible by the chancellor, would provide support for the chancellor's decision, this Court may not intercede simply to substitute our collective opinion for that of the chancellor." *Polk v. Polk*, 332 So. 3d 348, 352 (¶14) (Miss. Ct. App. 2021) (quoting

---

[25] The italics appear in this opinion to indicate the portions of the amended final judgment, dated July 12, 2022, that were added or that deviated from the original judgment dated March 15, 2022.

10

*Hammers v. Hammers*, 890 So. 2d 944, 950 (¶14) (Miss. Ct. App. 2004)).

## DISCUSSION

### I.      Custody of E.W.

¶19.    Sam argues the chancellor erred by awarding sole physical custody of E.W. to Brandy because he asserts the chancellor erred in its application of several of the *Albright* factors. The court found three of the *Albright* factors favored Brandy, two favored Sam, and five were neutral. The specific findings of the court and Sam's arguments as to each will be discussed in separate subheadings below. In appeals from child-custody decisions, our polestar consideration, like the chancellor's, must be in the best interest of the child. *Montgomery v. Montgomery*, 20 So. 3d 39, 42 (¶9) (Miss. Ct. App. 2009) (citing *Hensarling v. Hensarling*, 824 So. 2d 583, 587 (¶8) (Miss. 2002)). We are prohibited from substituting our judgment for the chancellor's. *Hammers*, 890 So. 2d at 950 (¶14). We may only reverse a child-custody determination if the chancellor was manifestly wrong, clearly erred, or applied an erroneous legal standard. *Smith v. Smith*, 97 So. 3d 43, 46 (¶7) (Miss. 2012).

¶20.    When a chancellor properly applies and considers the child-custody factors from *Albright*, there is no manifest error. *See Smith v. Smith*, 614 So. 2d 394, 397 (Miss. 1993). The *Albright* factors are as follows: (1) age, health, and sex of the child; (2) continuity of care prior to the separation; (3) parenting skills and the willingness and capacity to provide primary child care; (4) the employment of the parent and responsibilities of that employment; (5) the physical and mental health and age of the parents; (6) the emotional ties of parent and child; (7) the moral fitness of the parents; (8) the home, school, and community record of the

child; (9) the preference of the child at the age sufficient to express a preference by law; (10) the stability of the home environment and employment of each parent; and (11) other factors relevant to the parent-child relationship. *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

¶21. An *Albright* analysis is not a "mathematical formula." *Polk*, 332 So. 3d at 353 (¶15) (citing *Lee v. Lee*, 798 So. 2d 1284, 1288 (¶15) (Miss. 2001)). Rather, it "is one of the most difficult decisions that courts must make." *Brewer v. Brewer*, 919 So. 2d 135, 141 (¶21) (Miss. Ct. App. 2005). "[E]ven when the trial judge sensitively assesses the factors noted in *Albright* and [its] progeny, the best the judiciary can offer is a good guess." *Love v. Love*, 74 So. 3d 928, 932 (¶17) (Miss. Ct. App. 2011) (quoting *Buchanan v. Buchanan*, 587 So. 2d 892, 897 (Miss. 1991)).

¶22. Our supreme court has held that "[a]ll the [*Albright*] factors are important, but the chancellor has the ultimate discretion to weigh the evidence the way he sees fit." *Johnson v. Gray*, 859 So. 2d 1006, 1013-14 (¶36) (Miss. 2003). "The chancellor, by [his] presence in the courtroom, is best equipped to listen to witnesses, observe their demeanor, and determine the credibility of the witnesses and what weight ought to be ascribed to the evidence given by those witnesses." *Mabus v. Mabus*, 890 So. 2d 806, 819 (¶56) (Miss. 2003) (citing *Rogers v. Morin*, 791 So. 2d 815, 826 (Miss. 2001)). "[T]he *Albright* factors exist to ensure the chancellor considers all the relevant facts before she reaches a decision." *Blakely v. Blakely*, 88 So. 3d 798, 803 (¶17) (Miss. Ct. App. 2012) (citing *Lee*, 798 So. 2d at 1288 (¶15)). And our review for manifest error is not a mechanical check on the chancellor's scorecard to see

12

if she "tallied" each parent's score correctly. *See id*. Instead, we ask whether the chancellor considered all relevant facts, giving deference to the weight she assigns each factor. *Id*. We turn to Sam's claims on appeal concerning the *Albright* factors.

### A. Age, Health, and Sex of E.W.

¶23. Sam argues the chancellor erred in failing to find that the age, health, and sex of the child *Albright* factor favored him. The chancellor found that this factor was neutral because E.W. was a male child, nine years old, in good physical and mental health and was "active in school and community activities." The court added that "*while [E.W.] is male, and will benefit from his father's guidance, the [c]ourt finds that he will benefit from guidance from both parents. The [c]ourt finds that the specific facts of this case do not weigh in favor of either party as it relates to E.W.'s age and sex.*"[26] The chancellor based its opinion on substantial evidence and we will not now re-weigh that evidence. *See Barnett v. Oathout*, 883 So. 2d 563, 566 (¶6) (Miss. 2004) ("The chancellor has the sole responsibility to determine the credibility of witnesses and evidence, and the weight to be given each."). We find no reversible error as to this finding.

### B. Parenting Skills

¶24. Sam argues the court erred in finding the parenting skills *Albright* factor favored Brandy. At trial, Brandy testified that her mother, Pam, was E.W.'s full-time babysitter while both parties worked. In 2016, Pam stopped acting in this capacity because she overheard Sam spanking E.W. in an "extremely harsh manner." Pam testified she heard "loud slaps,

---

[26] The italics represent the additional language added to the court's amended final judgment.

whipping, and [E.W.] screaming." Sam testified he "spanked [E.W.] a couple of times, and then had a conversation with him, and he calmed down." According to Sam, Pam did not witness the spanking. Sam testified he and Brandy had several conversations regarding the incident and Brandy never expressed concern over the spankings and assured Sam he "did the right thing." An email exchange between Brandy and Pam detailing the incident was admitted into evidence.

¶25. The court found this factor favored Brandy and based this finding on testimony that "suggested Sam had a short temper[,]" which included the 2016 spanking incident. The court further emphasized that Brandy testified that she "took [E.W.] to church, helped with homework, helped with school projects, and attended all school events." Ultimately the court found "*that when considering the testimony and the credibility of the witnesses, the [c]ourt was convinced that while both parents were active in E.W.'s life and engaged parents, this factor favored Brandy.*" The chancellor's decision was based on the testimony of the parties and their credibility as determined by the court and we will not reweigh that credibility. *Barnett*, 883 So. 2d at 566 (¶6). We find no error.

### C. Continuity of Care Prior to the Separation

¶26. Sam argues the court erred in finding this factor neutral. At trial, Sam testified that, after Pam ended her employment as E.W.'s full-time babysitter, he became E.W.'s "primary caretaker" due to Brandy's "tremendous amount" of work travel during that time. Sam testified they hired babysitters to drive E.W. to and from school or for "small periods" of time. Both parties testified to being heavily involved in E.W.'s care. The chancellor found

this factor favored neither party and noted that both parties attended doctor's appointments and school meetings prior to the separation. The chancellor considered Brandy's "extensive travel schedule" and Sam's "extremely flexible" work schedule but ultimately was "not convinced that Sam was the primary caregiver for E.W. since there were several nannies or babysitters who cared for E.W." The chancellor "*considered that both parents were active, . . . but based on the testimony presented, the [c]ourt conclude[d] that this factor favor[ed] neither party*." We find no error.

### D. Home, School, and Community Record of the Child

¶27. Sam argues the chancellor erred in finding that this factor favored Brandy. The testimony indicated that E.W. attended Coast Episcopal School from the time he was "about two" years old. Brandy testified she took E.W. to church. Both Sam and Brandy testified that E.W. was a "good boy" and excelled in school. Both testified to being actively involved in his life. The court found that E.W. was "involved in school and sports activities, as well as piano lessons." However, the court ultimately found that this factor favored Brandy. This finding was based on the fact that while "both parents [were] involved in his school and community activities, . . . the testimony showed that Brandy was the force behind E.W.'s school and community involvement. *The [c]ourt [found] that based on the evidence presented and the credibility of the witnesses, Brandy was more involved in E.W.'s school and community life, although Sam was by no means an absent or uninvolved parent*." There was substantial evidence to support the factual determinations by the chancellor on this factor, and this Court will not reweigh the court's credibility determinations. Therefore, we

15

find no error. *Id.*

### E. Stability of the Home

¶28. Sam argues the court erred in finding that this factor favored Brandy. At trial, Brandy testified that she and E.W. have a "very good routine." The chancellor considered that Brandy's work schedule required her to "regularly be away overnight," but the chancellor noted that "this travel [was] what support[ed] the entire family, and [he was] not convinced that her home [was] less stable due to overnight travel." The amended final judgment stated the following:

> Sam argue[d] in his Rule 59 [m]otion that the calendar introduced at trial which showed the number of days that Brandy was away for work show[ed] that she has a less stable work environment, but as detailed above, the [c]ourt has considered Brandy's work travel and concluded that it has been a necessary element of her employment which supports the entire family, and despite the absences, Brandy has provided a stable home environment for E.W., and his home with Brandy is in a neighborhood with friends and the home that he has grown up in.

The chancellor's decision was based on substantial evidence and we will not re-weigh that evidence. *Id*. We find no error.

### F. Other Factors and Totality of the Circumstances

¶29. Sam argues the chancellor erred in finding this factor neutral because he failed to consider that Brandy drove "after drinking with [E.W.] in the car leading to an accident," left E.W. so she could "go on vacation with [Cody]," and "travel[ed] anywhere from 11-15.5 days a month[.]" At trial, Brandy testified that they would frequently attend social gatherings at their neighbor's houses and would consume alcohol. On one such occasion, Brandy recalled hurting her foot while jumping into the neighbor's pool. On another occasion,

16

Brandy recalled backing out of the neighbor's driveway and hitting the neighbor Jonathan Malley's vehicle because she "didn't realize he was behind [her]." The court heard testimony from Jonathan, who corroborated Brandy's testimony and indicated he never saw Brandy "slurr her speech." Brandy testified that on another occasion, she backed into the neighbors' fence while explaining to E.W. how the "backup cameras" worked.[27] Brandy testified that she had "a drink or two" prior to each of these incidents but was "not intoxicated." Brandy maintained that E.W.'s "safety [was] [her] number one priority." Sam extensively questioned Brandy regarding her purchases and consumption of alcohol.

¶30. In the final judgment, the chancellor considered Brandy's relationship with Cody and noted that "E.W. . . . never met Cody *in the context of his relationship with Brandy.*"[28] Furthermore, "[t]he [c]ourt dealt with Brandy's relationship with Cody in the moral fitness [*Albright*] *factor.*" The chancellor considered testimony from Sam and Brandy's neighbors who stated that "Brandy's behavior did not stand out to them" and both suggested that "Brandy did not drink any more than anyone else at the social gatherings they held, and they'd never heard her slur her speech." The chancellor considered Brandy's alleged "driving after drinking" incident when it discussed the physical and mental health and age of the parents *Albright* factor. Ultimately, however, the court found that factor neutral, and Sam does not challenge that finding on appeal. Further, the court repeatedly considered Brandy's extensive travel schedule as well as her relationship with Cody. In fact, the court

---

[27] A photograph of the damaged fence was entered into evidence.

[28] However, the court acknowledged that E.W. did meet Cody outside of this context, while he was married to Brandy's cousin.

found that the moral fitness *Albright* factor favored Sam because of Brandy's inappropriate relationship with Cody. Ultimately, the court considered all of the testimony and evidence in its *Albright* analysis and awarded physical custody of E.W. to Brandy. The chancellor was "best equipped to listen to witnesses, observe their demeanor, and determine the credibility[.]" *Mabus*, 890 So. 2d at 819 (¶56). Therefore, we will not substitute our collective opinion for that of the chancellor. *Hammers*, 890 So. 2d at 950 (¶14). Because there was substantial evidence to support the findings of the chancellor, we find no error on the custody issue.

## II. Award of Child Support to Brandy From Sam

¶31. Sam maintains the chancellor erred by ordering him to pay child support beyond the statutory guideline and failing to "make a written finding or specific finding that the presumptive amount **was unjust or inappropriate.**" (Citing *Bruton v. Bruton*, 271 So. 3d 528, (¶16) (Miss. Ct. App. 2018); *Southerland v. Southerland* (*Southerland I*), 816 So. 2d 1004, 1005 (¶9) (Miss. 2002)). The chancellor found Sam's average monthly adjusted gross income was $3,391.46. He then applied the statutory amount of 14 percent for one child, and ordered Sam to pay Brandy $474.90 per month in child support for E.W. The chancellor further ordered Brandy and Sam to divide the cost of E.W.'s private school tuition with Brandy paying two-thirds and Sam paying one-third. In its amended final judgment, the chancellor ordered the following:

> The Mississippi Supreme Court has held that private school tuition is part of child support. *Bruton v. Bruton*, 271 So. 3d 528 (Miss. Ct. App[.] [2018]) (internal citations omitted). As such, Sam's obligation to pay 1/3 of E.W.'s tuition raises his child support obligation over the statutory 14% of his

18

adjusted gross income, prompting the [c]ourt to make a specific finding as to why it has deviated from the statutory percentage. The [c]ourt finds that Sam and Brandy agreed that E.W. should attend Coast Episcopal. Sam testified to this, and argued in his Rule 59 Motion that he toured the school and made a joint decision with Brandy as to enrolling E.W. there, so it is reasonable for him to contribute to E.W.'s educational expenses. The court finds that the consistent testimony throughout the trial was that Sam was not working at his full capacity prior to the separation, so in light of his earning capacity, property division, and his interest in E.W.'s education at Coast Episcopal, it is appropriate to deviate from the statutory child support amount and assess 1/3 of the private school tuition to Sam.

The chancellor repeatedly emphasized E.W.'s involvement in extracurricular activities and that"[E.W.] does well as far as grades." Additionally, both parties testified that E.W. was excelling at Coast Episcopal.

¶32. Under our law, a non-custodial parent of one child should pay 14% of his or her adjusted gross income for child support. Miss. Code Ann. § 43-19-101(3)(b) (Rev. 2015). There is "[a] rebuttable presumption of justness or appropriateness" for an award based upon these guidelines, but it "may be overcome by a judicial or administrative body . . . making a written finding or specific finding on the record that the guidelines are inappropriate in a particular case." *Bell v. Bell*, 206 So. 3d 1254, 1258-59 (¶8) (Miss. Ct. App. 2016) (citing Miss. Code Ann. § 43-19-103 (Rev. 2015)).

¶33. "The guidelines are, however, merely guidelines, and they 'do not control per se the amount of an award of child support.'" *Id.* (quoting *Clausel v. Clausel*, 714 So. 2d 265, 267 (¶8) (Miss. 1998)). The chancery court "has special knowledge of the actual circumstances," *Gunter*, 281 So. 3d at 286 (¶10) (quoting *McEachern v. McEachern*, 605 So. 2d 809, 814 (Miss. 1992)), so "a departure is permissible when the chancery court mak[es] a written

finding on the record that the application of the guidelines would be unjust or inappropriate." *Id.* (quoting *Dunn v. Dunn*, 695 So. 2d 1152, 1155 (Miss. 1997)). Private school tuition costs should be treated as a part of child support and should not be "calculated separately from and in addition to the support award." *Id.* at (¶11) (citing *Southerland I*, 816 So. 2d at 1006 (¶11)). "Even where parents agree to send children to private school, support awards made in consideration of this expense must also be reasonable in light of both parents' financial means." *Southerland I*, 816 So. 2d at 1006 (¶11). The Mississippi Supreme Court has upheld a chancellor's order requiring a father to pay private school tuition where the chancellor made requisite findings under Mississippi Code Annotated section 43-19-101(2) and (4) found he was "able to meet the expense" financially. *Southerland v. Southerland* (*Southerland II*), 875 So. 2d 204, 206 (¶10) (Miss. 2004).

¶34.   In *Southerland II*, the Supreme Court affirmed a child support award that exceeded the statutory guidelines because it deemed private school tuition an extraordinary expense. *Id.* at 204 (¶2). In that case, the father was ordered to pay $1,000 per month in child support. *Id.* The father appealed and claimed that the child support award exceeded "14% of [his] adjusted gross income" under the "guideline amount provided in Miss. Code Ann. § 43-19-101 (Rev. 2000)." *Id.* (citing *Southerland I*, 816 So. 2d at 1005). On appeal, the Supreme Court reversed and remanded on the issue of child support, "finding that the chancery court had failed to make the written findings as required by § 43-19-101(2) & (4)." *Id.* at (¶3). On remand, the chancellor made the following special findings:

> [T]he application of the guidelines under Section 43-19-101(4) would be unjust and inappropriate in this case. Furthermore, the amount which the

20

Court is awarding in child support is reasonable in view of the fact that [the father]'s income was in excess of $50,000.00.

*Id.* at (¶4). The father once again appealed the chancery court's judgment. *Id*.

¶35. In *Southerland II*, the Supreme Court addressed the issue for the second time. *Id*. at (¶1). The court found that "[o]n remand, the chancery court properly made . . . findings in compliance with this [c]ourt's decision, and specifically found that [the father]'s actions with regard to sending his daughter to private school amounted to extraordinary expenses not contemplated by the statutory guidelines." *Id*. at 207 (¶7). The Supreme Court held, "The chancery court found that [the father] was able to meet the expense and that he ha[d] the ability to earn a substantial income while [the wife] ha[d] a comparatively small source of income." *Id*. at (¶8). The Supreme Court further held, "As with any child of school age, [the minor child]'s daily routines revolve around her school, and she had attended the private school "ever since [the Southerlands] moved back to Mississippi." *Id*. Further, the Supreme Court found that the father made "no showing that the chancery court's finding [was] manifestly in error, or that the chancellor abused his discretion in awarding child support for [the minor child] in the sum of $1,000 per month." *Id*. at (¶9). Accordingly, the Supreme Court affirmed as to the issue of child support. *Id*.

¶36. Here, it is undisputed that "the chancellor was required to make a written finding or specific finding that the presumptive amount was unjust or inappropriate." *Southerland I*, 816 So. 2d at 1006 (¶9). In fact, the chancellor explicitly acknowledged this duty in its final order. The chancellor then based his deviation from the statutory guidelines on three main grounds: (1) Sam was not working at his full capacity prior to the separation, (2) Sam agreed

21

to send E.W. to private school and had an interest in E.W. continuing that private school education, and (3) Sam received a larger portion of assets in the chancellor's equitable distribution analysis. Further, the chancellor found E.W. had attended school at Coast Episcopal his whole life, and was "active" and "involved" in his school and community. Given all of this, the chancellor determined Sam had the ability to "meet the expense" of one-third of E.W.'s private school education. *Southerland II*, 875 So. 2d at 206 (¶10). Here, the chancellor's written and specific finding comports with the requirements under our law and therefore we find no error.

### III. Marital Property and Equitable Distribution

¶37. Sam argues the chancellor erred in its marital property valuation and equitable distribution analysis on several grounds. The chancellor ordered the following as marital property:

1. The marital home at 24614 Mare Point Drive in Pass Christian, Mississippi, with equity in the amount of $206,654.41.
2. The Toyota Sequoia with a value of $16,600.00[.]
3. The Honda Accord with a value of $1,500.00.
4. A portion of Brandy's Hologic retirement account (marital portion valued at $698,156.86 . . . ).
5. *The American express balance as of November 27, 2019 when Brandy became the sole cardholder which was $24,354.33. . . .*[29]
6. The Bank of America balance of $21,679.21 as of the temporary order . . . .
7. *The lot in Arkansas valued at $53,000.00.*
8. The parties' joint bank accounts (BancorpSouth accounts ending in 9925, 9917).
9. Each party's personal property as resolved by agreement of the parties . . . .

---

[29] The text that was added or altered in the amended final judgment was italicized to show its departures from the original judgment. We have done the same in this opinion.

The chancellor found the following to be separate property:

1. Each party's *separate* credit card debts and/or bank loans from the date of demarcation forward.
2. Brandy's inheritance from her father's estate (she has taken a partial distribution of at least $100,000.00).
3. Brandy's Hologic account equity which was accumulated prior to the marriage and after November 20, 2020.
4. *Brandy's Chevrolet Silverado truck, which was a gift from her father.*
5. Brandy's 2017 Lexus SUV.
6. *The equity in the 22' Nautic Star in the amount of $6,625.00 which was a gift from Brandy to Sam immediately prior to the separation.*
7. Sam's Suntrust account[.]
8. Brandy's Wells Fargo account valued at $3,500.00[.]
9. *Brandy's Discover card debt in the amount of $1,843.44 and the debt on the American express from November 27, 2019 forward.*

The court then went through each of the *Ferguson* factors as follows:

1. *Direct or indirect contributions to the acquisition of property:* The [c]ourt finds that Brandy clearly made the vast majority of the direct contributions to the acquisition of property. There is no homemaker presumption in this matter as Sam purportedly worked throughout the marriage, although his economic contribution was minimal. However, Sam did contribute to the stability of the home by caring for E.W. while Brandy traveled for work. This factor favors Brandy.
2. *Need:* The Court does not find that either party has a greater need outside the marriage with regard to finances, as both have shown their ability to earn an independent living. Brandy has a higher earning capacity, but there was no testimony that showed that Sam is incapable of earning a living and caring for himself financially. This factor favors neither party.
3. *Separate Estate of the Parties:* Brandy has a larger separate estate when considering the nonmarital portion of her retirement account. Brandy is also a beneficiary of her father's estate, as well as a beneficiary of a $100,000.00 life insurance policy although at the time of trial, she had received only a partial distribution. She testified to an early distribution of $41,000.00, and she stated that she had paid her attorney $15,000.00 from the estate account. Exhibit 8 also shows checks to Brandy in the amount of $72,550.00 from the estate account. Based on Brandy's larger separate estate, this factor favors a larger distribution of marital property to Sam.

23

4. *Elimination of need for alimony:* The [c]ourt finds that based on the length of the marriage and both parties' ability to provide for themselves financially, an equitable division of the assets will preclude the need for periodic alimony. The [c]ourt does note that based on the evidence provided, there is a disparity in the income of the parties. However, the [c]ourt notes that Sam does not work fulltime. This factor favors a larger distribution to Sam in order to eliminate the need for Brandy to make alimony payments of any sort. *In light of the Rule 59 Motion, the [c]ourt revisited the classification of marital and nonmarital assets and liabilities. Based on the adjustments made by the [c]ourt, Sam is receiving a significantly larger distribution of the marital estate, which coupled with his earning capacity, eliminates the need for alimony and any* Armstrong *findings.*

5. *Fault:* The [c]ourt finds that Brandy's infidelity as discussed above significantly contributed to the instability and break down of the marriage. This factor favors Sam.

6. *Dissipation of Assets:* The [c]ourt does not find that either party dissipated marital assets. At first glance it appears that Brandy had extravagant spending habits, but the [c]ourt does not find that she dissipated assets.

7. *Tax Consequences:* There was no testimony that would convince the [c]ourt that division of the marital estate would create tax issues for either party.

¶38. Based on its consideration of the *Ferguson* factors, the court divided the marital assets to each party and illustrated the distribution by way of the following chart:

| Asset | Value | Debt | Equity | Brandy | Sam |
|---|---|---|---|---|---|
| Marital Home | $975,000.00 | $768,345.59[30] | $206,654.41 | | $206,654.41 |
| Marital portion of Hologic Account | $698,156.86 | | $698,156.86 | *$383,986.27* | *$314,170.59* |
| Sequoia | $16,600.00 | | $16,600.00 | | $16,600.00 |

---

[30] The chart in the final judgment included a footnote which provided that "this figure represent[ed] the amount owed to the bank at the date of demarcation, as well as the debt owed to Brandy's father's estate for the land on which the home sits."

| | | | | | |
|---|---|---|---|---|---|
| Honda | $1,500.00 | | $1,500.00 | | $1,500.00 |
| Lending Club | | $11,598.60 | | ($11,598.60) | |
| Boat | $48,975.00 | $42,349.75 | $6,625.25 | | $6,625.25 |
| *AK Lot* | *$53,000.00* | | *$53,000.00* | *$53,000.00* | |
| Bank of America Card | | $21,679.21 | | ($21,679.21) | |
| American Express [Card] | | *$24,354.33* | | *($24,354.33)* | |
| Total | | | | $379,354.13 | $545,550.25 |

¶39. Sam presents five assignments of error in the chancellor's analysis of the marital property and equitable distribution: That the chancellor erred in finding that (1) Brandy's father's estate held a loan on the marital home, (2) only $698,156.86 of Brandy's retirement account was marital property, (3) the Chevy Silverado driven by Sam was Brandy's separate property, (4) only the equity in the boat, gifted to him by Brandy, was Sam's non-marital property, and (5) certain personal property left in the marital home was Brandy's property. Each of these issues will be discussed in turn.

¶40. "When this Court reviews a chancellor's judgment of property division we are to review the judgment to ensure that the chancellor followed the appropriate standards and did not abuse his discretion." *Stroh v. Stroh*, 221 So. 3d 399, 406 (¶17) (Miss. Ct. App. 2017) (citing *McKnight v. McKnight*, 951 So. 2d 594, 596 (¶6) (Miss. Ct. App. 2007)). "The guidelines that chancellors must employ in equitable distribution are as follows: (1) classify the parties' assets as marital or separate, (2) value those assets, and (3) divide the marital assets equitably." *Wheat v. Wheat*, 37 So. 3d 632, 637 (¶14) (Miss. 2010) (citing *Ferguson*

*v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994)). Our Supreme Court "has defined marital property as 'any and all property acquired or accumulated during the marriage. Assets so acquired or accumulated during the course of the marriage are marital assets and are subject to an equitable distribution by the chancellor.'" *Id*. (quoting *Hemsley v. Hemsley*, 639 So. 2d 909, 915 (Miss. 1994)).

¶41.    "[A]n equitable division of property does not necessarily mean an equal division of property." *Chamblee v. Chamblee*, 637 So. 2d 850, 863-64 (Miss. 1994). "The intent of equitable distribution is to assure that after taking into account all relevant factors, including the separate estates of the parties, the contributions of each party toward the accumulation of the marital estate, and the needs of each party, to the extent reasonably possible, each party is given sufficient assets to accommodate his needs." *Stroh*, 221 So. 3d at 410 (¶31) (citing *Wideman v. Wideman*, 909 So. 2d 140, 144 (¶14) (Miss. Ct. App. 2005)). We now turn to Sam's issues on appeal.

### A.    Loan from Brandy's Father's Estate

¶42.    Sam argues that there was no outstanding loan owed to Brandy's father's estate. At trial, Brandy testified that in 2014 her father, Richard, purchased a 10-acre lot in Pass Christian and deeded 5.7 of those acres to Brandy and Sam with the intention that they would pay him back in full. The marital home was then built on this land. The only document evincing this exchange was a warranty deed executed March 2, 2015.[31] At the time of trial,

_____

[31] The warranty deed was executed by Ratliff Brothers LLC, an entity owned by Richard. This warranty deed was admitted into evidence.

26

Brandy testified that there remained a $32,850 balance on the loan.[32] Sam testified that he first learned of the loan owed to Richard shortly after the parties separated. He stated they were discussing the equity on the house in preparation for the divorce; he "questioned [Brandy's] figures[,] . . . and that's when Brandy told [him] that the property that the house was built on was a debt owed to her father's estate." Sam claimed this came as a "surprise" to him. Sam testified it was his "understanding that the property was a gift[.]"[33] The chancellor found that the marital home was valued at $975,000.00 with equity of $239,504.41.[34] The chancellor further found the following:

> There was conflicting testimony regarding the validity of the loan to the estate. Sam testified that they (he and Brandy) did not owe the estate for the purchase of the lot, but he testified that if any money was owed, he did not owe it. He argue[d] that the loan was not valid as there was no documentation for it submitted into evidence, and Brandy did not begin making payments until 2020. The [c]ourt weighed the credibility of the witnesses and found Brandy's testimony more credible as it related to the purchase of the lot. Considering this additional loan, the [c]ourt finds the equity in the marital home is $206,654.41.

¶43. The court had two occasions to consider the validity of the loan: (1) in its initial order dated March 15, 2022, and (2) in its amended final judgment dated July 12, 2022. The chancellor had two inconsistent factual versions from the parties as to the loan. One party said it existed and one said it did not. Factual issues in dispute are resolved by the

---

[32] Brandy testified she began making payments to Richard's estate for this loan in April or May 2020.

[33] This understanding was derived from a conversation between Sam and Richard. The court allowed this conversation into the record Mississippi Rule of Evidence 803(3).

[34] The chancellor accepted Sam's appraisal of the home's value as being "more credible in light of recent market trends and the improvements to the home[.]"

chancellor, and we will not now substitute our opinion for that of the chancellor's. *Barnett*, 883 So. 2d at 566 (¶6). Further, the chancellor weighs the credibility of the witnesses, not this Court. *Mabus*, 890 So. 2d at 819 (¶56). The chancellor ultimately found Brandy's testimony to be more credible. We find no error.

### B.     Valuation of Brandy's Retirement Account

¶44.    Sam claims the chancellor erred in valuing the premarital and marital portion of Brandy's retirement account. Brandy's uncontradicted Rule 8.05 financial statement was admitted into evidence. This reflected a balance of $138,000.00 in the retirement account on the date of the parties' marriage. Further, Brandy testified that she had worked for Hologic for 20 years, and throughout this time, she regularly contributed the maximum monthly value toward her retirement account. Brandy testified that on the date of the temporary order in November 2020, her account was valued at $838,733.87. By the date of trial, this value had grown to $1,095,195.78. This reflected a growth of $256,461.91.[35] First, Sam argues that the chancellor "erred in finding that $140,577.01 of Brandy's retirement account" was her premarital property because Brandy never produced retirement statements reflecting the premarital account balance "until [she was] instructed to do so by the trial court[.]"[36] He maintains Brandy should "not be given an opportunity to cure her deficiencies in discovery and/or trial months after the trial." Second, Sam argues that the chancellor erred in finding that the marital portion of Brandy's retirement account was only $698,156.86

---

[35]    The record indicated that during this time period, Brandy only contributed $13,112.71 toward her retirement account.

[36]    The court entered an order to supplement the record on January 7, 2022.

28

because he "fail[ed] to consider" the $243,349.20 "growth between the date of demarcation and the trial date[.]" Both of these arguments will be discussed in turn.

¶45. At the time of trial, Brandy had worked for Hologic for twenty years. The parties were married on October 2, 2010, and the initial temporary order was dated November 20, 2020. The chancellor found that on the date of the parties' marriage, "Brandy's Hologic retirement account was valued at $140,577.01," and the chancellor determined that this portion was non-marital. Sam claims this valuation was erroneous because Brandy did not submit documentation until she was ordered to do so by the chancery court. Brandy's Rule 8.05 financial statement, as well as her testimony regarding the premarital value of the account, were admitted without objection. *See Ross v. State*, 16 So. 3d 47, 57 (¶21) (Miss. Ct. App. 2009) ("The failure to object to testimony at trial "waives any assignment of error on appeal." (quoting *Johnson v. State*, 477 So. 2d 196, 214 (Miss. 1985))). This argument is without merit.

¶46. Turning now to Sam's argument concerning the marital portion of the retirement account, at the time of the temporary order dated November 20, 2020, "the account was valued at $838,733.87[.]" Accordingly, deducting the pre-marital contributions, the chancellor found that $698,156.86 was marital property. The chancellor noted that "undoubtedly some portion of this total is reflective of passive growth on the premarital portion of Brandy's account, but Brandy did not establish what portion of the November 20, 2020, total is reflective of passive growth." The chancellor acknowledged that Brandy failed to utilize an expert to establish the appreciation of the account, so the chancellor found that

29

"since Brandy made continued contributions to the Hologic account throughout the marriage, any nonmarital passive growth converted into marital funds." The chancellor further stated the following:

> The [c]ourt must note that Sam benefitted from Brandy's failure to utilize an expert or provide documentation about the percentage of the marital portion of Brandy's retirement account was due to passive growth on the premarital portion. Had Brandy provided that information, Sam would have most likely received a smaller portion of the retirement account. Despite this, Sam, in his Rule 59 motion, brings forth an argument related to the same principle, but in his motion, he takes issue with the fact that there was insufficient documentation as it related to the growth on the retirement account for the date of demarcation until the date of trial. It cannot be both ways. The [c]ourt did not have the benefit of an expert witness or cohesive documentation that would allow it to determine what was passive growth or active growth at any point. Additionally, the [c]ourt points out that the figures upon which Sam relies to make this argument are the figures that the [c]ourt requested in its post trial order, the same one to which he objects.

The chancellor ultimately awarded Sam 45% of the marital portion of Brandy's Hologic account, giving him $279,262.74.

¶47. The "chancellor has the discretion to draw the line of demarcation." *Wildman v. Wildman*, 301 So. 3d 787, 794 (¶12) (Miss. Ct. App. 2020) (quoting *Billingsley v. Billingsley*, 240 So. 3d 422, 433 (¶32) (Miss. Ct. App. 2017)). The chancellor, therefore, appropriately used the date of the temporary order as the date of demarcation. *See Randolph v. Randolph*, 199 So. 3d 1282, 1285 (¶9) (Miss. Ct. App. 2016) ("[A] chancellor may consider a temporary order as the line of demarcation between marital and separate property."). It is not error for the date of demarcation to mark the end of the accumulation of marital assets. *See Dauenhauer v. Dauenhauer*, 271 So. 3d 589, 598 (¶34) (Miss. Ct. App. 2018). Accordingly, it was not error for the demarcation date of November 20, 2020 to mark

30

the end of the accumulation of marital assets as to Brandy's retirement account.

¶48. The separate opinion states that "the chancellor erred by treating the post-demarcation appreciation of the marital portion of Brandy's 401(k) account as Brandy's separate property rather than marital property." The chancellor ordered that the appreciation of Brandy's retirement account after the date of demarcation was Brandy's separate property. He explained that he could not determine what was active or passive "at any point" as he "did not have the benefit of an expert witness or cohesive documentation that would allow [him] to" do so. His finding was based on the evidence provided by the parties, which comprised only of "snapshots of the values of the Hologic account at the time of the temporary order . . . and as of the trial." This Court has held that "when a chancery court makes a valuation judgment based on proof that is less than ideal, it will be upheld as long as there is some evidence to support its conclusion." *Norwood v. Norwood*, 305 So. 3d 175, 178 (¶14) (Miss. Ct. App. 2020).

¶49. The separate opinion cites *Fleishhacker v. Fleishhacker*, 39 So. 3d 904, 913 (¶¶43-45) (Miss. Ct. App. 2009), for the proposition that the "'passive appreciation [of a marital asset] *after the line of demarcation*' is a 'marital asset' subject to equitable distribution." *Post* at ¶63. That is what *Fleishhacker* held. However, *Fleishhacker* is distinguishable. In that case, the wife retained and called a witness who was tendered as an expert in asset valuation. *Id*. at (¶44). Here, the chancellor "did not have the benefit of an expert witness" or adequate documentation that would have allowed him to determine passive and active growth." The parties did not retain an expert, nor did they call one to testify on this issue. Accordingly, "to

the extent that further evidence would have aided the chancellor in these decisions, the fault lies with the parties and not the chancellor." *Messer v. Messer*, 850 So. 2d 161, 170 (¶43) (Miss. Ct. App. 2003) (citing *Ward v. Ward,* 825 So. 2d 713,719 (¶21) (Miss. Ct. App. 2002)). Therefore, we find no error in the chancellor's factual determination.

### C. The Chevy Silverado as Separate Marital Property

¶50. Sam argues the court erred in finding the 2005 Chevy Silverado was Brandy's separate property. At trial, Brandy testified that "in 2011 or 2012" her father, Richard, gifted her the truck. Brandy testified that "up until the point of separation" she and Sam "drove the truck equally." Sam testified he "primarily drove it." The chancellor found that the "Chevy Silverado that Sam [drove] was a gift to Brandy from her father and is not marital property based on *Brandy's testimony that the vehicle is titled in her name only. The [c]ourt [found] that there was not enough evidence to find that the vehicle, which was a gift from Brandy's father, had been converted to marital property through Sam's use of it.*" The chancellor's decision was based on the testimony of the parties and their credibility as determined by the court and we will not reweigh that credibility. *Barnett*, 883 So. 2d at 566 (¶6). We find no error.

### D. The Boat

¶51. Sam argues the chancellor erred by not ordering Brandy to pay off the $42,000 owed on the boat and instead allowing Sam to purchase the boat from Brandy. At trial, Brandy testified that in early September 2019, she gifted Sam a boat for his 50th birthday with the "intention that it would be something he would be able to use and make memories with

[E.W.]" At the time of trial, the testimony indicated that the boat had a remaining balance owed of $42,000. The chancellor granted Sam's rule 59 motion as to the 22" Nautic Star boat. The chancellor found, "[T]*he Nautic Star boat was a gift to Sam, and the equity is his nonmarital property. Sam has thirty (30) days from the date of this order to purchase the boat from Brandy (minus his equity) for the Blue Book value and have it refinanced and titled in his name only. Should he not exercise his option to purchase, Brandy may keep or sell the boat and any proceeds from the sale will be awarded to Brandy.*" The chancellor's decision was based on the testimony of the parties and their credibility as determined by the court and we will not reweigh that credibility. *Id*. We find no error.

### E. Personal Property Without Value

¶52. Sam argues the chancellor erred in awarding the personal property left in the marital home to Brandy. The court found that "[a]*nything not divided by way of D-32, which is located in the marital home, will be awarded to Brandy. This includes 4-wheelers, trailers, and lawn mowers. If there is any remaining property not divided, it shall belong to the party who possesses it.*"

¶53. Here, the chancellor explained his findings in detail and appropriately classified the property as marital pursuant to *Hemsley* "and conducted a detailed analysis of all the *Ferguson* factors in distributing the marital property." *See Randolph*, 199 So. 3d at 1287 (¶18) (citing *Selman v. Selman*, 722 So. 2d 547, 554 (¶29) (Miss. 1998) (stating reversal is warranted "only where the failure to make sufficient findings of fact and conclusions of law constitute[s] manifest error."))). The chancellor made sufficient findings of fact and

conclusions of law and we cannot say that the chancellor abused his discretion.

## IV. Alimony

¶54. Sam argues that the chancellor's "failure to award Sam alimony of any kind was grossly inadequate and unjust." In the court's temporary order, dated November 20, 2020, Brandy was ordered to pay Sam $2,500 a month in temporary alimony. In the final judgment of divorce dated July 12, 2022, the court ordered that "[*b*]*ased on the adjustments made by the* [*c*]*ourt, Sam is receiving a significantly larger distribution of the marital estate, which coupled with his earning capacity, eliminates the need for alimony and any* Armstrong *findings*." The chancellor emphasized that "Sam was awarded more in the property division to account for the vastly larger separate estate Brandy has and the disparity in their current earnings *and in order to eliminate the need for alimony*."

¶55. "Alimony awards are [also] within the discretion of the chancellor, and his discretion will not be reversed on appeal unless [he] was manifestly in error in his finding of fact and abused his discretion." *Stroh*, 221 So. 3d at 406 (¶18) (citing *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993)). However, "if we find that the court applied an erroneous legal standard, we will not hesitate to reverse." *Id*. Alimony should be considered only if, after the parties' assets are equitably divided, there are not "sufficient assets to provide for both parties" and one party is left with "a deficit." *Id.* at 412 (¶43) (citing *Carter v. Carter*, 98 So.3d 1109, 1112 (¶8) (Miss. Ct. App. 2012)). "[T]he 'deficit' to which our cases refer is not one spouse's receipt of assets with a lesser net value than those allocated to the other spouse." *Id*. (citing *Layton v. Layton*, 181 So. 3d 275, 282 (¶17) (Miss. Ct. App. 2015)).

34

"Rather, the question is whether the spouse seeking alimony is left 'with a deficit with respect to having sufficient resources and assets to meet his or her needs and living expenses.'" *Id.* "[A]limony and equitable distribution should be considered together." *Lauro v. Lauro*, 847 So. 2d 843, 849 (¶14) (Miss. 2003) (citing *Mace v. Mace*, 818 So. 2d 1130, 1131 (¶16) (Miss. 2002)). "[W]here one expands, the other must recede." *McLaurin v. McLaurin*, 853 So. 2d 1279, 1284 (¶13) (Miss. Ct. App. 2003) (quoting *Ferguson*, 639 So. 2d at 929). Sam received temporary alimony up until the final judgment of divorce, and a distribution of marital assets with a total value of $545,550.25, while Brandy received a distribution worth $379,354.13.[37]

¶56. Sam cites *Hammond v. Hammond*, 327 So. 3d 173 (Miss. Ct. App. 2021), for the notion that "[s]ignificant disparity in earning capacity is a major factor in the determination of a periodic alimony award." *Id.* at 180 (¶21). However, in *Hammond*, this "significant disparity in earning capacity" factor was considered as part of an *Armstrong* analysis. *Id.* at (¶20). An *Armstrong* analysis is conducted if, "after the marital estate is divided[,]" *id.* (citing *Layton*, 181 So. 3d at 282 (¶17)), a party is still "left with a deficit." *Id.* (citing *Armstrong*, 618 So. 2d at 1280). Here, the chancellor repeatedly discussed and considered the significant income disparity between Brandy and Sam in its equitable distribution analysis. It was, after all, *because of* the disparity in income that Sam received a larger distribution of marital assets. Once the marital property was distributed, the chancellor determined there was no deficit, which justified the denial of an award of alimony to Sam.

---

[37] This figure is based on the chart used in the chancellor's final judgment.

The chancellor had two occasions to consider the issue of equitable distribution, and, after considering Sam's Rule 59 motion and ruling in his favor in part, Sam was awarded an additional $41,533.10 in marital assets.[38] Again, alimony is considered only after the marital property has been equitably divided and the chancellor determines one spouse has suffered a deficit. *Stroh*, 221 So. 3d at 412 (¶43). Sam clearly did not suffer a deficit after the marital estate was equitably divided. In fact, he received $545,550.25 in marital assets—a greater share than was awarded to Brandy. The chancellor did not abuse his discretion in declining to award Sam alimony. We find no error.

## V.    Attorney's Fees

¶57.    Sam argues the chancellor erred in not awarding Sam his attorney's fees because he has the "inability to pay[.]" The court found that each party would be responsible for their own attorney fees. In its final judgment, the chancellor considered Sam's "*property division, the amount of the legal fees, and* [*Sam's*] *ability to earn a living in determining that each party shall be responsible for their respective bills.*" "A trial judge's award of attorneys' fees is reviewed under the abuse of discretion standard, and the award of attorneys' fees must be supported by credible evidence." *Coleman v. Coleman,* 324 So. 3d 1204, 1209 (¶10) (Miss. Ct. App. 2021) (citing *McNeese v. McNeese*, 119 So. 3d 264, 274 (¶26) (Miss. 2013)). The determination "as to whether or not awarding attorney's fees is appropriate is largely within the sound discretion of the chancellor." *Coleman*, 324 So. 3d at 1215 (¶32). "[W]here a party

---

[38] This number was calculated by taking the difference between Sam's award in the original judgment of divorce, which was $504,017.15, and his award from the amended final judgment, which was for $545,550.25.

is financially able to pay her attorney, an award of attorney's fees [is] not appropriate."

*Pacheco v. Pacheco*, 770 So. 2d 1007, 1012 (¶26) (Miss. Ct. App. 2000) (internal quotation marks omitted). Here, the chancellor clearly based its denial of attorney's fees on the ground that Sam had the ability to pay due to the $545,550.25 he received in the equitable distribution. We cannot say that the chancellor abused his discretion.

## CONCLUSION

¶58. The chancellor did not err in awarding sole physical custody of E.W. to Brandy or in the calculation of Sam's child support payments. Likewise, the chancellor did not err in his valuation of the marital assets or in his equitable distribution between the parties. Further, the chancellor did not err in not awarding Sam alimony. Finally, the chancellor did not err in not awarding Sam his attorney's fees. We affirm.

¶59. **AFFIRMED.**

**CARLTON, P.J., AND GREENLEE, J., CONCUR. McDONALD AND McCARTY, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. BARNES, C.J., WESTBROOKS AND EMFINGER, JJ., CONCUR IN PART AND DISSENT IN PART WITHOUT SEPARATE WRITTEN OPINION. WILSON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, C.J., WESTBROOKS AND EMFINGER, JJ.; McDONALD AND McCARTY, JJ., JOIN IN PART. SMITH, J., NOT PARTICIPATING.**

**WILSON, P.J., CONCURRING IN PART AND DISSENTING IN PART:**

¶60. I concur that the chancery court's judgment should be affirmed with respect to child custody and support and the denial of alimony and attorney's fees. I dissent in part and would reverse and remand the equitable distribution of the marital estate because the chancellor misclassified the passive appreciation on the marital portion of Brandy's 401(k)

account and the 2005 Chevy Silverado as Brandy's separate property and erroneously included Sam's separate property (his equity in the NauticStar boat) in the equitable distribution of the marital estate.

### *Brandy's 401(k) Account*

¶61. Brandy's 401(k) account was valued at $140,577.01 at the time of the parties' marriage and $838,733.87 on the date of the temporary order (November 20, 2020), which the chancellor used as the date of demarcation. The chancellor found that the premarital value of the account was Brandy's separate property. The chancellor also "note[d] that undoubtedly some portion of [the account's value on the date of demarcation was] reflective of passive growth on the premarital portion of Brandy's account." However, "Brandy did not establish what portion of [the account's value was] reflective of passive growth" on the premarital portion of the account. That is, Brandy presented insufficient evidence of her contributions or the growth of the account during the marriage. Therefore, the chancellor found that the entire increase in the value of the account from the date of the marriage to the date of demarcation ($698,156.86) was marital property.[39] I would affirm the chancellor's reasoning and findings to this extent.

¶62. The evidence also showed that Brandy's account grew from $838,733.87 on the date of demarcation to $1,095,195.78 at the time of trial, an increase of $256,461.91. Brandy's testimony and earnings statements showed that during that period, Brandy contributed only

---

[39] *See, e.g.*, *Dauenhauer v. Dauenhauer*, 271 So. 3d 589, 598 (¶38) (Miss. Ct. App. 2018) ("[T]he party arguing to classify an asset as nonmarital property has the burden to demonstrate to the court the asset's nonmarital character." (quoting *Wheat v. Wheat*, 37 So. 3d 632, 640 (¶26) (Miss. 2010)).

about $13,112.71 to the account. The rest of the growth in the account—$243,349.20—was attributable to passive growth. It follows that approximately 83.24% of that amount ($202,563.87) was attributable to passive growth on the *marital* portion of the account.[40] Nonetheless, the chancellor held that the *entire* post-demarcation increase in the account was Brandy's separate property.

¶63. The chancellor erred in treating the passive growth on the marital portion of the account as Brandy's separate property. In *Fleishhacker v. Fleishhacker*, 39 So. 3d 904 (Miss. Ct. App. 2009), this Court held that "passive appreciation [of a marital asset] *after the line of demarcation*" is "a marital asset" subject to equitable distribution. *Id.* at 913 (¶¶43-45) (citing Deborah H. Bell, *Bell on Mississippi Family Law* § 6.02[3][b] (1st ed. 2005)).[41] Our holding in *Fleishhacker* is consistent with Mississippi Supreme Court's decision in *Hensarling v. Hensarling*, 824 So. 2d 583 (Miss. 2002),[42] and the analysis of *Bell on Mississippi Family Law*.[43] Therefore, the chancellor erred by treating the post-demarcation

---

[40] As noted above, the chancellor found that the total value of the account on the date of demarcation was $838,733.87 and that the value of the marital portion of the account was $698,156.86. Therefore, the value of the marital portion represented 83.24% of the total value of the account ($698,156.86 ÷ $838,733.87). To be precise, a small fraction of the post-demarcation increase was undoubtedly attributable to passive growth on Brandy's post-demarcation contributions; however, Brandy presented no evidence to establish that point.

[41] In *Fleishhacker*, as in this case, the chancery court had used the date of the temporary order as the date of demarcation. *Id.* at 913 (¶43).

[42] *Id.* at 591-92 (¶25) (holding that wife was entitled to "the interest accrued [on the marital portion of investment accounts] from the date of [demarcation] to the date of the [f]inal [j]udgment").

[43] Deborah H. Bell, *Bell on Mississippi Family Law* § 6.02[3][b], at 147 (3d ed. 2020) ("Passive appreciation will take the classification of the underlying asset. Thus, interest that

appreciation of the marital portion of Brandy's 401(k) account as Brandy's separate property rather than marital property.

¶64. Contrary to the lead opinion, Sam did not forfeit his rights to this marital property by not "retain[ing] an expert." *Ante* at ¶49. The evidence clearly established that the account increased in value by $256,461.91 between the date of demarcation and the trial, and Brandy acknowledges in her brief that her post-demarcation contributions account for only $13,112.71 of that increase. Therefore, the remainder of the increase—$243,349.20—is attributable to passive growth in the account. *Id.* If Brandy wanted to show that some small fraction of that growth was attributable to her post-demarcation contributions, she could have done so by providing the court with *her own* account statements and some relatively straightforward calculations. But she failed to do so. In the absence of such evidence, the chancellor should have allocated the post-demarcation passive growth in the account based on the respective values of the marital and separate portions of the account on the date of demarcation.

¶65. The lead opinion cites *Messer v. Messer*, 850 So. 2d 161 (Miss. Ct. App. 2003), in which this Court stated that "when a chancellor *makes a valuation judgment* based on proof that is less than ideal, it will be upheld as long as there is *some evidence to support his conclusion*." *Id.* at 170 (¶43) (emphasis added). But the problem here is that the chancellor *did not make any* "valuation judgment" regarding the post-demarcation growth of the marital

accrued after a cutoff date on the marital portion of a retirement account [is] marital property." (citing *Hensarling*)); *id.* § 7.03[2], at 221 ("[P]assive growth [of a retirement account] after the cutoff date should be based on the classification of the account at the cutoff date—growth attributable to the marital share will be marital . . . .").

40

portion of the account. *Id.* Rather, the chancellor simply declared that a significant "marital asset" (*Fleishhacker*, 39 So. 3d at 913 (¶45)) was Brandy's separate property. There is *no* "evidence to support [that] conclusion." *Messer*, 850 So. 2d at 170 (¶43). Accordingly, the decision should be reversed and the case remanded for the chancellor to divide this marital property.

### 2005 Chevy Silverado

¶66. "An inheritance or gift made to one spouse during the marriage remains the separate property of that spouse." *Allgood v. Allgood*, 62 So. 3d 443, 447 (¶13) (Miss. Ct. App. 2011). However, "family use" of such separate property will "convert [it] into marital property." *Id.* For instance, in *Pittman v. Pittman*, 791 So. 2d 857, 866-67 (¶31) (Miss. Ct. App. 2001), *overruled on other grounds by Collins v. Collins*, 112 So. 3d 428 (Miss. 2013), this Court held that furniture inherited by one spouse "was transformed into marital property by its placement into the marital abode in the absence of any evidence of exclusive use by" the spouse who inherited it. And in *Brame v. Brame*, 127 So. 3d 225, 230 (¶20) (Miss. Ct. App. 2000), *rev'd in part on other grounds*, 796 So. 2d 970 (Miss. 2001), we held that an inherited piano, clock, and dining set "became marital property" "once the[] items took on the new persona of fully family use" in the marital home. We have also stated that "the family-use doctrine will almost always convert a separately owned 'marital' home to marital property." *Faerber v. Faerber*, 13 So. 3d 853, 861 (¶28) (Miss. Ct. App. 2009).

¶67. Here, Brandy's father gifted her a 2005 Chevy Silverado in 2011 or 2012. Brandy testified that the gift was to her alone, while Sam testified it was a gift to both of them.

Brandy also testified that she and Sam "both drove the truck equally" until their separation in 2020, while Sam stated that he "primarily drove" the truck and that Brandy only "drove it a couple of times."[44]  Even crediting Brandy's testimony in full, a truck that is gifted to one spouse but then shared and driven "equally" by both spouses for *eight to nine years* is transformed into marital property under the family use doctrine.  Therefore, the chancellor erred by holding that the Silverado remained Brandy's separate property and excluding it from the equitable distribution of the marital estate.

### *NauticStar Boat*

¶68.  The chancellor found that a NauticStar boat Brandy gave Sam for his fiftieth birthday "was a gift from Brandy to Sam" and that the equity in the boat ($6,625.25)[45] was Sam's separate property.[46]  The chancellor gave Sam thirty days to buy the boat from Brandy for the boat's value minus his equity.  The judgment provided that if Sam did not exercise his option to buy the boat, Brandy could keep it or sell it and retain all proceeds.  Sam ultimately bought the boat from Brandy according to the terms of the final judgment.  On appeal, Sam argues that the chancellor erred by treating his equity in the boat as marital property and including the value of his equity in the equitable distribution of the marital estate.  Sam also argues that because Brandy gifted the boat to him, the chancellor "should have made Brandy responsible

---

[44] Brandy claimed that "[a]fter the separation, Sam kept the key from [her and] refused to let her drive [the Silverado]."  Brandy estimated that the truck's value was $7,625.

[45] Sam valued the boat at its Kelly Blue Book value of $48,975, and Brandy's Rule 8.05 financial statement listed the debt owed on the boat at $42,349.75.

[46] *See, e.g.*, *Fleishhacker*, 39 So. 3d at 914 (¶¶48-50) (holding that interspousal gifts that are "personal" in nature are the separate property of the recipient).

for the payment of the outstanding loan balance."

¶69. I agree with Sam in part. The chancellor found that the equity in the boat was a gift and Sam's separate property, so the chancellor should not have included its value in his equitable distribution analysis. *See, e.g.*, *Warner v. Warner*, 341 So. 3d 152, 164 (¶36) (Miss. Ct. App. 2022) ("[S]eparate property is not subject to equitable division . . . ."). The chancellor should correct this error on remand.

¶70. However, the chancellor did not err by granting Sam an option to purchase the boat by paying Brandy for the outstanding debt because that is precisely the relief Sam requested in his motion to alter or amend the judgment. Sam argued,

> The [chancellor] should have awarded the boat to Sam, awarding him the equity as a gift from Brandy and/or allowing him to be able to exercise the option to purchase the boat from Brandy (either privately or reducing the amount of distribution due to Sam as a result of the [chancellor's] equitable distribution analysis).

Sam cannot complain that the chancellor granted him the exact relief he requested. *See, e.g.*, *Busick v. St. John*, 856 So. 2d 304, 314 (¶25) (Miss. 2003) ("An appellant cannot complain on appeal of alleged errors which he invited or induced.").

### *Conclusion*

¶71. I would reverse the judgment with respect to the equitable distribution of the marital estate and remand for reconsideration of the equitable distribution in light of the three issues discussed above. I would affirm the judgment in all other respects. Accordingly, I respectfully concur in part and dissent in part.

**BARNES, C.J., WESTBROOKS AND EMFINGER, JJ., JOIN THIS OPINION. McDONALD AND McCARTY, JJ., JOIN THIS OPINION IN PART.**